UNITED STATES, Appellant,

v.

James A. WALTON, III, Appellee.

No. 13398.

District of Columbia Court of Appeals.

Argued Oct. 16, 1978.

Decided Oct. 12, 1979.

John H. Korns, Asst. U. S. Atty., Washington, D.C., with whom Earl J. Silbert, U. S. Atty., Washington, D.C., at the time brief was filed, John A. Terry and Edward D. Ross, Jr., Asst. U. S. Attys., Washington, D.C., were on brief, for appellant.

Paul K. Regan, Washington, D.C., appointed by this court, for appellee.

Before NEWMAN, Chief Judge, MACK, Associate Judge, and YEAGLEY, Associate Judge, Retired.

YEAGLEY, Associate Judge, Retired:

Appellee was charged in a six-count indictment with felony murder (D.C.Code 1973, § 22–2401), murder in the second degree while armed (D.C.Code 1973, §§ 22–2403, –3202), murder in the second degree (D.C.Code 1973, § 22–2403), attempted robbery while armed (D.C.Code 1973, §§ 22–2902, –3202), attempted robbery (D.C.Code 1973, § 22–2902), and carrying a pistol without a license (D.C.Code 1973, § 22–3204). Following a pretrial suppression hearing, the trial court granted appellee's motion to suppress all the identification testimony of the government's sole eyewitness, Melvin T. Jones, Jr. On appeal the government asserts that the court committed reversible error in that it misapplied the relevant law governing the admissibility of identification testimony. Although the government has made a very forceful and rather convincing argument, we are compelled to affirm the judgment of the trial court. As we read the findings of fact and conclusions, there is no error of law and there is evidence to support the findings of the court. Jones testified that at approximately 4 o'clock in the afternoon of January 3, 1977, he went to the residence of a friend, Richard Doug-

las. When Douglas admitted him to his third-floor apartment, another man, whom Jones did not recognize, was already there. Jones and the stranger nodded greetings and Jones sat down within 12 feet of him and joined in the conversation. Several times Jones looked directly at his face, but at some point during his stay he became afraid of the stranger because he realized that he was a man named "James," who had recently been released from prison. After about 20 minutes, Jones left the room at Douglas' request and went across the street to a liquor store to purchase some beverages. He returned to the building within five minutes and was mounting the last flight of steps to Douglas' apartment when he heard a sound like the rattle of keys coming from the inside of the apartment door. As Jones reached the top of the stairs and was standing about two feet from the door, the door burst open and "James" ran past him and down the stairs. "James" paused on the landing between the second the third floors, looked back at Jones, then ran on.

Entering the apartment, Jones saw Douglas emerging from his bedroom and holding his stomach. Douglas told Jones he had been shot and together they called the police. Jones stayed with Douglas until the police arrived, when Douglas was rushed to the hospital. The police then began to interview Jones, who described "James" to them as a light-skinned, black man in his late twenties, standing about six feet tall, with facial hair; he also was wearing a large beige coat, green pants and dark tan or brown hush puppy shoes.

Douglas died 18 days later on January 21, 1977. On January 23, the police interviewed Jones again and showed him photographs of possible suspects. Although he was unable to identify anyone from the photo arrays, he gave the police another description of "James," this one containing all the elements of his earlier description but adding more details, including the fact that "James" had been wearing a blue or black knit cap. Two days later, a police detective went to Jones' home and showed

him nine or ten pictures of black men in their late twenties or early thirties, but again Jones made no identification. The detective then drove Jones to police headquarters to view photos and slides of men named "James" who had recently been released from prison.[1] From this group Jones made a tentative selection of a black and white photograph of one James Young. After being shown a color slide of Young, Jones stated he thought the man either was the stranger at Douglas' apartment or looked like him.

On January 28, the police once more brought Jones to headquarters to view additional photographs. The detective assigned to the case became upset at the cursory manner in which he thought Jones was viewing the photos and with what he deemed was Jones' general lack of cooperation in the investigation. The detective thereupon told Jones that he was the police's prime suspect. He asked whether Jones would be willing to take a lie detector test, and Jones replied that he would. The test was set for February 10.

Meanwhile, on February 4, Jones met with a sergeant of the Homicide Squad. At that meeting Jones told the sergeant he had reflected on his selection of a photograph of James Young and that although the man in the photograph was similar to the man in Douglas' apartment in build and complexion, he did not believe this was the man and wished to withdraw that identification. However, he still could not identify anyone from a group of 21 black and white photographs shown to him immediately thereafter.

On February 10, the sergeant drove Jones to police headquarters, ostensibly to have Jones take the scheduled polygraph test. However, when the sergeant arrived at work he learned that a new suspect—appellee—had been developed by the police, and arranged to have his photograph placed in an array.[2] This photograph was a standard suspect photograph, i. e., it showed appellee from the waist up. The sergeant also knew that a full-length color slide of appellee made from the same negative as the black and white photograph was available from the Modus Operandi Section of the police department. Before taking Jones to have the polygraph tests administered, the sergeant had Jones view the photo array containing appellee's picture. This was the first time that Jones had seen a picture of appellee. Jones viewed the array of nine photographs and selected appellee's picture, stating that the man in the picture looked like the visitor in Douglas' apartment, but that he could not be certain it was the same man due to the texture of the photograph. The sergeant then asked Jones whether it would be helpful for him to view a full-length color slide of the man in the picture, and Jones said that it would. The sergeant put 10 slides in the projector, including the one of appellee, and told Jones to stop "when you get to the one you're looking for."[3] When Jones came to appellee's slide, he stopped the projector, walked to the wall upon which the image was projected and told the sergeant that this was the man. In response to a question, he said: "I'm positive that the man in the slide was the man in Douglas' apartment because he even has on the same shoes and looks like he has the

1. The record does not reveal whether Jones knew the men in the photos and slides were all named "James" or that they had recently escaped from prison.

2. He had been arrested on January 5, 1977, on an unrelated robbery charge two days after the shooting in this case, but the police did not consider him a suspect until February 9th.

3. This was Jones' testimony according to the transcript, but there is a dispute in the record and in the briefs submitted to this court as to whether the sergeant told Jones to stop at the same slide as the photograph he had selected

or at any slide containing the man he recognized. In either event, there is no disagreement that the torso photograph of appellee and the full-length color slide were made from the same negative. Furthermore, it is undisputed that the sergeant told Jones that included in the group of slides was a full-length color slide of the person Jones had selected. We conclude that although Jones knew he was looking for a particular slide, it was of no significance since the purpose of the viewing was to examine a photo with a better texture.

same hat that he had on that day." In this picture, appellee was holding a blue knit cap in one hand, one of his pants legs was rolled up to the knee, and he was wearing dark tan or brown hush puppy shoes.

Following Jones' identification of appellee, the sergeant told Jones that the man he had just selected was James Walton and that Walton had been introduced to the decedent by another man. In order to assuage Jones' fear of reprisal, he also told Jones that Walton was incarcerated.

A polygraph test was never administered to Jones. Nor does the record reveal whether the police ever undertook an investigation of James Young, the man whom Jones had identified earlier.

Six days after Jones selected appellee as the man in Douglas' apartment, Jones was brought to police headquarters to view a lineup in which appellee was included. After viewing the lineup Jones was unable to identify anyone.[4] However, once he was outside the witness room he inquired whether he was to view more suspects, and was told by the sergeant that he would not view anyone else. Jones then said to the sergeant, "Well, if he's in there, it's number 4." Fifteen minutes later the sergeant told Jones that number 4 was appellee.

At the suppression hearing, Jones testified that what stood out for him in the slide was appellee's face.

■ Although we might have arrived at other conclusions from this evidence than did the trial court, we set out its findings herewith in full since we are bound by those findings insofar as there is evidence to support them.

First of all, I find that there was ample opportunity for the witness to observe the subject because of the nature and length of the confrontation in the apartment, and the incident on the landing and stairs.

Coming first—or coming next to the black and white photographs, at this time, the witness was, to use an old cocker [sic] expression, under the gun—pressure had been increasing upon him because Officer Davis stated he did not always follow through on the polygraphs, he used it as a method of obtaining—suggesting the polygraph of obtaining further cooperation or more information from witnesses.

Nonetheless, there was, by the time the first black and white photograph from which an identification was made where viewed, a continuing, increasing pressure on the witness, since he was at that point, actually going down, virtually going down the hall for the polygraph test. He was under a compulsion in the opinion of this Court, to make an identification.

Regarding the slides, there's not any doubt in my mind, that the slide was suggested—the pant leg rolled up, immediately stands out among all of the pictures. I find the age group to be similar, the physical characteristics of those in the array to be similar, but I find that the pant leg rolled up was highly suggestive.

Regarding the lineup, the situation was disastrous, to say the least. I don't recognize anyone, but if it's all you've got, it's number four. At this point the witness in my opinion, was like Pavlov's dog—he was responding to identify the defendant. Once he had identified the black and white photograph, it was an easy step to the markedly dissimilar slide to pick him out and from the slide, was easy thereafter, to identify at the lineup. The witness was under increasing pressure to make an identification. The purpose of the slides was to verify the black and white photograph, the identification from the black and white photograph.

As I've said, even though there was duress and great pressure on a witness to make the identification, even though he

4. The government asserts that appellee changed his appearance for the lineup by shaving his face and cutting his hair very short as shown in the photograph of the lineup, which was in violation of a court order. In concluding that the lineup identification made by Jones was tainted, the court did not mention this difference, although the matter was brought to its attention.

was in my opinion certain that he was a suspect in the case or about to be charged in the case if he did not make an identification, even though the pant leg was rolled up, I find no evidence of deliberate misconduct by the police.

We have here an accurate and continuing good description, but little, if any, cooperation or little ability to convert that description, visual description, into a composite drawing.

As I said, I find no vagueness or uncertainty in the original description of the subject, nor do I find any waivering [sic].

Considering the capacity of the witness, his demeanor, in my opinion the totality of the circumstances raised a very substantial likelihood of irreparable misidentification. I find that the slide was impermissibly suggestive; I find that the identification from the black and white photograph was in response to severe and immediate duress and that the lineup identification at best, was a subject of duress and by that time the witness had seen two pictures, one of which was suggestive, one coercive if not both coercive, which added [sic] in the lineup identification.

At this point, I find that while there was an ample independent source of identification, that that identification has been so tainted by the duress and improper suggestiveness inherent, that looking at the totality of the circumstances, even though it is a case of first degree murder, I find that it would, if not actually be, an aberration in the administration of justice, it could well appear to be.

I find that this entire proceeding would make the entire proceeding a mockery of justice and therefore, I suppress not only the black and white photographic identification, the slide identification and the lineup identification but I find at this point that any in Court identification, even based on independent source, so impermissibly tainted to be improper.

I find the defense has carried its burden of proof beyond a reasonable doubt and all of the identification evidence is suppressed.

The government contends that the identification procedures utilized by the police were not unduly suggestive or coercive. Even if they were, argues the government, Jones' observations at the time of the murder render his pretrial selections of appellee and his anticipated in-court identification nonetheless reliable.

The Supreme Court has established constitutional due process safeguards and rules governing the admissibility of identification testimony by an eyewitness, beginning with its 1967 trilogy of *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); and *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), and ending with its recent decision in *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

The "central question" a court must ask when it considers a claim that due process has been violated by improper identification procedures is "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive" and we would add, or coercive. *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). In *Manson v. Brathwaite, supra*, 432 U.S. at 114, 97 S.Ct. at 2253, the Court said "reliability is the linchpin in determining the admissibility of identification testimony." However, more than minimal suggestivity must exist for reliability to be in issue. A confrontation must be "so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." [5] *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968).

---

**5.** This statement is a slight rephrasal, without change in content, of the standard enunciated in *Stovall v. Denno, supra*, whether "the confrontation conducted . . . was so unnec-essarily suggestive and conducive to irreparable mistaken identification that [the accused] was denied due process of law." 388 U.S. at 301–02, 87 S.Ct. at 1972.

■ Several factors are to be considered by the court in determining whether the identification procedures were so suggestive or coercive as to foster misidentification and affect reliability. These factors, as enunciated in *Neil v. Biggers, supra,* are: "[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation." 409 U.S. at 199–200, 93 S.Ct. at 382. To this list, this court has added the element of any prior misidentification by the witness. *See Patterson v. United States,* D.C.App., 384 A.2d 663, 666 n. 4 (1978). The inferences of trustworthiness derived from consideration of these factors are weighed against the corrupting influence of the suggestive procedure. *Manson v. Brathwaite, supra,* 432 U.S. at 114, 97 S.Ct. 2243.

■ The court found the rolled-up pants leg in the slide picture to be suggestive.[6] However, we need not resolve the question of suggestivity, since we sustain the court's finding as to coerciveness. Jones had been told he was a suspect and when he made his first photo identification of appellee he was at the police station for the purpose of taking a polygraph test. Even though there is no suggestion that the witness was afraid to take the lie detector test or that he understood it as a threat, we recognize the possibility that such was in fact the case and cannot say that both of those inferences are unreasonable. Accordingly, we accept the finding of the trial court as to coerciveness and therefore affirm its suppression of all the out-of-court identifications. Once taint is found, the court must proceed to the second stage of the inquiry: the assessment of whether the identification is nonetheless reliable, based on the facts enumerated in *Manson, supra,* and *Biggers, supra. Patterson v. United States, supra* at 666.

In ruling that it would not permit an in-court identification, the court specifically noted that Jones had an "ample opportunity to observe" the other man in the victim's apartment and that his two descriptions were unusually detailed. Although the court concluded that "there was an ample independent source of identification", it added that it was so tainted by duress and improper suggestiveness "that it would . . . be an aberration in the administration of justice" to permit it. The court also added, "I find . . . that any in-court identification, even based on an independent source, so impermissibly tainted [as] to be improper." At first blush, there seems to be an inconsistency in the two conclusions (1) that there was an independent source, and (2) that an in-court identification would not be permitted because it was impermissibly tainted.

■ It has been said that when there is clear and convincing evidence that the ultimate identification is the product of a source independent of any suggestive procedures, an identification can be deemed reliable and testimony regarding it admissible. *United States v. Wade, supra,* 388 U.S. at 240, 87 S.Ct. 1926; *Patterson v. United States, supra* at 665–66.

One commentator has described the essentials of an independent source for a witness' in-court identification as follows:

An in-court identification has an independent source when the suppression hearing judge can find on the basis of the factors discussed, that the identifying witness by drawing on his memory of the events of the crime and his observations of the defendants during the crime, has retained such a definite image of the defendant that he is now able, in court, to make an identification of the defendant without dependence upon or assistance from the tainted pretrial confrontation and unaffected by any observations, prompting or suggestions which there took place. [N. Sobel, *Eye-Witness Iden-*

---

**6.** Earlier, the court seemed to accept the explanation of the police that the subject in the

photo had an injured knee when the photograph was taken.

*tification: Legal and Practical Problems* § 68 at 122 (1972).]

In *Neil v. Biggers*, 409 U.S. 188, 196–97, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the Supreme Court, *quoting from Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) said:

> [W]e hold that each case must be considered on its own facts, and that convictions based on eye-witness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. [Citation omitted.]

Accordingly, the Court in *Biggers* concluded 409 U.S. at 198, 93 S.Ct. at 381 that "the primary evil to be avoided is a very substantial likelihood of irreparable misidentification" and that it is that likelihood which violates a defendant's right to due process.

The court's ruling here as to the likelihood of misidentification is complicated by the fact that there was no evidence of pressure on Jones to identify a particular person. There was no suggestion at trial nor has there been any here that the man selected did not fit the two earlier descriptions given by Jones of the assailant and as it developed, the photograph selected turned out to be that of a man who had in fact been in prison, and also had been acquainted with the victim, in conformity with Jones' statements to the police.

When a case is tried by a court without a jury, we "may review both as to the facts and the law, but the judgment may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it." D.C.Code 1973, § 17–305(a). Accordingly, we will defer to the findings and conclusions of the trial court if supported by the evidence and if not in conflict with legal principles by which we are bound.

The trial court did not deal with the factor of the witness' degree of attention nor with the level of certainty demonstrated by the witness at the photo and slide identifications "or the length of time between the crime and the confrontation." Applying the remaining three of the five test factors of *Neil v. Biggers, supra*, to the instant case, it appears that (1) the elapsed time from the offense to Jones' first identification of the appellee was something less than six weeks compared to the seven months in *Biggers*; (2) Jones testified that he had paid special attention to the stranger after he learned who he was and because he was afraid of him; and (3) as to his level of certainty of his identification, he said of the black and white photo: "This looks like him;" and of the colorslide, he said he was "positive."

A reading of the findings suggests that the trial court here was saying that while Jones' viewing of the assailant for 20 minutes supplied the requirements of an independent source, nonetheless, subsequent occurrences such as the coercion imposed on Jones by the threat of a lie detector test immediately before he made his first identification of appellee so tainted the entire process as to preclude a holding that an in-court identification would be based on an independent source. Rather, the court concluded such an identification would likewise be tainted. The trial court held in the end that there was no really independent source upon which a valid in-court identification could be based. That court had the advantage of observing the witnesses, there is evidence to support its findings, and they are not contrary to law. Accordingly, the judgment is

*Affirmed.*