Damian D. LONG, Appellant,

v.

UNITED STATES, Appellee.

No. 94–CF–699.

District of Columbia Court of Appeals.

Argued March 13, 1996.

Decided Oct. 28, 1996.

Mindy A. Daniels, appointed by the court, for appellant.

Chun T. Wright, Assistant United States Attorney, with whom J. Ramsey Johnson, Acting United States Attorney at the time the brief was filed, and John R. Fisher and Thomas C. Black, Assistant United States Attorneys, were on the brief, for appellee.

Before FERREN and TERRY, Associate Judges, and KERN, Senior Judge.

FERREN, Associate Judge:

A jury found appellant, Damian Long, guilty of assault with intent to rob three victims while armed, D.C.Code §§ 22–501 & –3202 (1996 Repl.), on September 8, 1992, at about 10:30 p.m., at 12th and Orren Streets, N.E. He also was found guilty of attempted robbery while armed, *id.* §§ 22–2902, –3202, and felony murder while armed, *id.* §§ 22–2401, –3202, of another victim several minutes later on Trinidad Avenue, N.E., a block away from the first crime.[1]

Long cites four grounds for appeal. First, he contends the police conducted an unduly suggestive pretrial identification procedure for the Orren Street victims, creating a substantial likelihood of misidentifying Long as the assailant—and thus tainting irreparably the victims' subsequent in-court identifications of Long as the armed man who assaulted them. Second, he says the trial court erroneously joined the Orren Street and Trinidad Avenue offenses for trial and then abused its discretion in denying the defense motion for severance. Third, Long argues that the prosecution failed to present sufficient evidence at trial to support the jury's findings, implicit in the verdict, that (1) Long had been attempting to rob all three of the Orren Street victims when he pointed a pistol at them, and that (2) several minutes later on the same evening, Long had been attempting to rob the murder victim on Trinidad Avenue—the felony underlying his murder conviction. Finally, he maintains the Trinidad Avenue attempted robbery merged with the felony murder conviction. We affirm in part, reverse in part, and remand for reconsideration of Long's severance motion.

## I.

The prosecution presented at trial a series of witnesses who testified that the following events occurred on September 8, 1992. Sometime around 5:30 to 6:00 p.m., appellant Long left the apartment of Scholethia Monk, located at Holbrook Terrace, N.E., where he had been spending time with Ms. Monk, her brother (David), and Kimberly Bridgeford. Long was dressed in a black suede jacket with fringe, a black shirt, black jeans, black boots, and a black silk-stocking skull cap. The Holbrook Terrace apartment was only a few blocks from the area where the Orren Street and Trinidad Avenue incidents at issue here took place.

Several hours later, at about 10:30 p.m., a man dressed in a black fringed jacket, black pants, and black shoes—later identified as

---

1. The jury also convicted Long, in connection with the Orren Street incident, of one count of possession of a firearm during a crime of violence (PFCV), D.C.Code § 22–3204(b) (1996 Repl.), and, as to the Trinidad Avenue incident, of one count of PFCV and one count of carrying a pistol without a license, *id.* § 22–3204.

Damian Long—approached the three Orren Street victims, Sabrina Fox, Carla Davis, and Guy Foster, who were standing in the street on the driver's side of the car that was parked against the curb in front of Fox's home. They were attempting to open the door and window of the car with a coat hanger because they had inadvertently locked the keys inside. Long crossed over to them from the opposite side of the street, pointed a revolver at them, and said something to the two women that sounded like "get the fuck out of here." He then pressed the pistol against Foster's head and demanded his money. When Foster protested that he had none, Long put his hand in Foster's pants pockets and satisfied himself that this was true. Long then ordered Foster to crawl under the car, and Long walked away in the direction of Trinidad Avenue.

Fox and Davis had fled in the same direction. They feared that their assailant was following them, so they hid in an alleyway a few blocks away from where the car was parked. Fox and Davis then heard gunshots and unsuccessfully tried to flag down a passing police cruiser. They hailed a taxi and went to a nearby police precinct where they told their story and gave a description of the perpetrator.

In the meantime, Fox's mother, Penelope Boyd–Fox, who had witnessed the assault on the three from the porch of her home on Orren Street, had immediately telephoned "911" for help. While she was still on the phone to the police department emergency number, she heard gunshots nearby. At about the same time, Foster came out from under the car and fled to his home on Orren Street. He telephoned the police to report the crime. While on the phone with the police, he heard gunshots and reported that as well.

Deborah Alford, a neighbor of Louis Johnson from Trinidad Avenue, was sitting on her front porch with several family members at approximately 10:30 p.m. the same night. A few minutes earlier, she had seen Johnson park his Suzuki sports vehicle on the street and enter his home several doors away. Apparently returning home from work, Johnson had been wearing his Army uniform. Shortly thereafter, Alford saw Johnson walking from his home, dressed in his bathrobe, and returning to his Suzuki. At this moment, Alford saw a man dressed in a black jacket ("I didn't know it had suede fringes on it"), black pants, and a black skull cap walking in Trinidad Street alongside the parked cars. Alford saw the man in black, after he had passed by Johnson, take out a pistol from his jacket and turn back toward Johnson as Johnson put the keys into the car's doorlock. Alford next saw the man in black and her neighbor "tussling." Frightened by the sight of the pistol, she and the others fled into their home. A few seconds later, Alford heard a series of gunshots. Johnson was later pronounced dead of gunshot wounds.

Kimberly Bridgeford testified that at around 5:00 p.m. on September 8, 1992, she and her boyfriend, David Monk, had gone with Damian Long to David's sister's, Scholethia Monk's, apartment on Holbrook Terrace. After awhile, Long left the apartment and, shortly thereafter, Bridgeford and David Monk left to go the store. On the way to the store, Bridgeford heard gunshots, saw an ambulance, and walked by the Trinidad Avenue murder scene where she saw Johnson lying on the street with blood all over him. Bridgeford and David Monk then returned to the Holbrook Terrace apartment and found Long on the front porch. Long told Bridgeford that he had "shot a man on Trinidad Avenue because the man tried to rob him with a knife."

Scholethia Monk testified that Long returned later to her Holbrook Terrace apartment on September 8, 1992 "panicking and sweating." Long had told Monk that "two dudes" had tried to rob him on Trinidad Avenue and that he had just shot one of them. There was blood on Long's face, he no longer wore a skull cap, and he was carrying a pistol. Long put the gun under a couch. Monk told Long to get his pistol out of her apartment. He then wrapped it in a plastic bag and took it outside. Ten days

later, the police recovered a gun from under the seat of the car where Long's close friend, Monk's brother, had been sitting just before they found the gun. A ballistics expert was "positive" that a bullet recovered from the scene of the murder on Trinidad Avenue had been fired by that pistol.

Homicide detective Willie Toland investigated the Trinidad Avenue case. When he arrived at the scene, he noticed a black skull cap seven feet from the place where Johnson had been shot, and Johnson's keys were still in the Suzuki's passenger door lock. As Toland investigated the crime scene, Foster arrived and informed Toland of what had happened earlier on Orren Street. Toland spoke with Davis and Fox later the same night and a few days later conducted a video lineup in which they identified Long as their attacker.

## II.

Long first argues that an impermissibly suggestive out-of-court identification procedure violated his right to due process. *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). Specifically, he says in his brief that "the identification procedure was suggestive, conducive to irreparable misidentification and not reliable under the totality of the circumstances. As a result, Fox and Davis' out-of-court identification[s] and subsequent in-court identification[s] should have been ruled inadmissible."

### A.

The trial court held a pretrial hearing on Long's motion to suppress Davis's and Fox's identifications of Long as the man who confronted them with a pistol on Orren Street at about 10:30 p.m. on September 8. Detective Willie Toland, the officer who showed Fox and Davis the video lineup, was the only witness to testify at the hearing. Toland testified that the identification procedure—a lineup—occurred at 1:00 p.m., on September 10, a day and a half after the Orren Street

offenses occurred. The detective responsible for bringing the two witnesses to the lineup arrived late, however, because he had not been able to find their residences when he drove to pick them up. Fox and Davis accordingly missed viewing a "live" lineup of individuals standing in a row, each with a number on a shield attached to him. Detective Toland, therefore, showed each witness "a videotape of the lineup pan." Separately viewing this video, Long and Fox each identified Long as the Orren Street assailant.

The trial court and counsel both viewed the videotape which the police had shown the witnesses.[2] Defense counsel pointed out to the trial court that, of all the persons shown in the video, only Long had been wearing a black shirt—an aspect of the lineup demonstrating that the process had been impermissibly suggestive.

The trial court, in what it termed a "preliminary" ruling, explained the way the video lineup differed from a live lineup:

> [W]hile the Government is calling this a lineup, it is not a lineup. A lineup is when seven people or nine people or a certain number of people are presented to you all at once, and you have an ability to compare them; compare their height, their weight, their faces, their hair, their complexions. And lineups are notoriously intended for comparative identifications.

> \* \* \* \* \* \*

> [This] video is not a video of the entire line at once. The video is a picture of each person in the line. In this case the video starts with the person on the extreme right of the line, shows the person's face, travels up and down the person to show the shield and then goes on to the next person from right to left. There are seven people that are gone through in this way on the video. Never in the video is the entire line shown at once.

The trial court commented that, in a photograph of the lineup that was not shown to the

---

2. The video tape is a part of the record on appeal, and this court has viewed it.

witnesses, Long had been the only person wearing black when everyone else in the lineup was wearing light colored clothing. The trial court noted that there was "no question but he—he stands out.... [E]verybody else is wearing a white shirt, and he's wearing an entire black outfit. What could be more suggestive than that?" But, according to the court, that suggestiveness was premised on observing the photograph of the lineup as a whole; there was no suggestiveness, said the court, in the way the lineup had been presented in the video, person by person. The trial court then concluded:

> The fact of the matter is he doesn't stand out on the video at all, and he doesn't stand out because of the manner in which the video was taken.

＊ ＊ ＊ ＊ ＊ ＊

[T]here just very simply was no suggestivity in the way this video was presented to the witnesses.... [T]he fact that they [the witnesses] were just asked to view the video, the fact that it wasn't frozen at any given point but allowed ... to proceed [on] its course, all lead me to conclude that there was no suggestivity here.

The trial court further concluded, preliminarily, that the witnesses' video identification of Long as their assailant had been reliable. The court noted that the identification had occurred on September 10, 1992, just two days after the crime; that Fox's and Davis's identifications on the night of the crime had "pretty accurately describe[d] the defendant"; and that both witnesses "were certainly in a position to be able to view the defendant with an eye towards trying to remember what he looked like[,] ... [and] their perspective ... was ... a good one." The trial court also found that Davis's statement that she had been 80% sure of her identification of Long was, under the circumstances, "a certain identification." The trial court accordingly concluded that "the identifications were reliable," pending Fox's and Davis's testimony at trial.

Davis testified at trial that she had parked almost directly in front of Fox's home in the 1100 block of Orren Street, N.E., on the night of September 8, 1992. Davis said that she, Fox, and Foster had all been in the street next to the car facing the house while Davis was using a coat-hanger to try to open the locked car door. Davis then had seen Long five to six feet away to her left with a black revolver in his right hand. She had seen Long's face and described him—immediately after she met with the police on the night of the crimes—as having a large nose, brown skin, and a slender build, about 5'9" to 6' tall. Long had worn a cap pulled tight on his head and had been dressed in a black jacket with tassels, in dark jeans, and in black shoes. Davis had been paying attention to his face, not to his clothing, although she had wondered why he was wearing his jacket "buttoned up" since the weather was so hot. Long had ordered her to go away, and she had looked again at his face before she ran and as she was running away.

Fox testified that she had seen Long walking up the street toward them as they stood beside the car. She had watched him because he looked to her as if he were "up to something" and a "possible thug." She also had noticed the assailant's approximate age and height, as well as his clothing: a black fringed jacket, black pants, and black shoes. Long had been carrying a revolver and had pointed it at them, whereupon Fox ran.

The trial court made "a final reliability finding" at the end of the trial testimony, concluding that Davis's pretrial identification of Long had been "highly reliable." The court noted that Davis had given the police a "rather accurate description of the defendant's face," "there were no prior misidentifications," "the identification occurred within ... a very short amount of time" since the crime, "there was a high degree of certainty ... in her identification," and she "was presenting her position in a very accurate way." The trial court further commented that Davis had "testified that it was kind of like [she was] going in slow motion ... where you see things start going slower and slower."

The trial court also found that Fox's pretrial identification had been "quite reliable."

Fox had picked out Long and another person from the video tape, saying Long had looked like her assailant but that the other person had the same "build." The court concluded that, given the quality of the video tape, it was not surprised that "a person viewing a video in this way picks out two persons inclusive of the defendant[, a]nd then later, upon seeing the defendant in person in court, has a different view of certainty." The court noted that Fox had been "in the exact same position as Ms. Davis was to be able to observe." The court then "found both witnesses to be quite articulate, and ... their identifications to be reliable."

### B.

■ In ruling on the admissibility of an eyewitness identification, the trial court conducts a two-part inquiry: (1) whether the identification was " 'unnecessarily suggestive and conducive to irreparable misidentification,' " and (2) whether, under " 'the totality of the circumstances,' " the "resulting identification was reliable nonetheless." *Stewart v. United States*, 490 A.2d 619, 622 (D.C. 1985) (citations omitted). The Supreme Court has emphasized that reliability can overcome an unnecessarily suggestive identification:

> [R]eliability is the linchpin in determining the admissibility of identification testimony.... The factors to be considered ... include [1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of his prior description of the criminal, [4] the level of certainty demonstrated at the confrontation, and [5] the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

*Manson*, 432 U.S. at 114, 97 S.Ct. at 2253; *see also Towles v. United States*, 428 A.2d 836, 845 (D.C.1981) (indicia of reliability outweighed suggestiveness); *In re L.W.*, 390 A.2d 435, 439 (D.C.1978) (same); *Cureton v. United States*, 386 A.2d 278, 285–86 (D.C. 1978) (assuming suggestive show-up procedures but holding identification nonetheless reliable and admissible); *but see United States v. Walton*, 411 A.2d 333, 338 (D.C. 1979) (indicia of reliability not sufficient to overcome suggestiveness); *cf. Henderson v. United States*, 527 A.2d 1262, 1263 (D.C. 1987) (remanding for trial court to determine whether reliability of pretrial photo array identification outweighed its unnecessary suggestiveness).

■ We note, first, that the identification procedure in this case was not free of suggestiveness. The lineup featured seven young black men, all attired in pants and short-sleeved shirts. However, only Long's shirt was black, and Davis and Fox had previously described the assailant as wearing a black jacket. Thus, as the trial court appears to have found, it was unduly suggestive ("What could be more suggestive than that?") for the police to allow Long alone to stand in a lineup in black when the witnesses had described their assailant as wearing black. *See McClain v. United States*, 460 A.2d 562, 566 (D.C.1983); *United States v. Sanders*, 156 U.S.App. D.C. 210, 479 F.2d 1193 (D.C.Cir.1973).

Furthermore, the detective who conducted the video lineup testified at trial that he had asked Fox and Davis "to take a look at the lineup video to see if they saw anyone that was involved in the earlier incident *in which an individual dressed in all black approached with a handgun.*" (Emphasis added.) This statement obviously added to the lineup's suggestiveness.

Because of the detective's reference to an "individual dressed in all black," the suggestiveness here was greater than in cases where this court has found no suggestiveness conducive to irreparable misidentification based on distinctive clothing. *See Stewart v. United States*, 490 A.2d 619, 622–23 (D.C. 1985) (defendant only person wearing light colored sweatsuit similar to clothing worn by the assailant); *Harley v. United States*, 373 A.2d 898, 900 (D.C.1977) (defendant wearing plaid coat similar to coat assailant was de-

scribed as wearing); *Davis v. United States,* 367 A.2d 1254, 1265 (D.C.1976) (defendant only person wearing dashiki after victim reported assailant wearing dashiki), *cert. denied,* 434 U.S. 847, 98 S.Ct. 154, 54 L.Ed.2d 114 (1977).

There were, however, several ameliorative facts that reduced the suggestiveness. First, the witnesses did not view a traditional lineup or even a videotape of one. As the trial court itself noted, because the videotape featured a pause-and-pan review of each participant, the witnesses would have been less likely to compare one participant with another, which comparison was the true source of suggestiveness; the procedure in this respect was akin to a photo array where the witness looks at suspects one by one.[3] Second, the witnesses avowedly concerned themselves primarily with the faces of the participants, and the videotape itself focused mainly on the faces. *See Davis,* 367 A.2d at 1265. Finally, despite the alleged suggestiveness, one of the witnesses picked out two participants, including one who was not wearing the suggestive clothing, again indicating that the black shirt was not of overwhelming importance. *See Harley,* 373 A.2d at 901.

We need not determine whether the trial court erred in concluding that these ameliorative facts were sufficient to overcome the suggestiveness inherent in the lineup because, even assuming the video lineup was unnecessarily suggestive, we are not persuaded the trial court erred in concluding that the witnesses' identifications were reliable nonetheless. *See Manson,* 432 U.S. at 114, 97 S.Ct. at 2253; *Henderson,* 527 A.2d at 1269. The trial court found that Long had confronted Fox and Davis with a pistol and spoken to them, providing these witnesses with a substantial opportunity to view his face as well as his clothing. Furthermore,

the witnesses each had given the police a description of the assailant within a few minutes of the episode, and those descriptions proved accurate. The witnesses had indicated, moreover, that they were confident of their respective identifications, beginning with a video lineup that occurred only two days after the Orren Street incident. Given these circumstances, we are not persuaded the trial court committed reversible error in concluding that the identifications bore substantial indicia of reliability that overcame any unnecessary suggestiveness. *Compare McClain,* 460 A.2d at 566–67 (identification reliable despite suggestive procedures), *with Sanders,* 156 U.S.App. D.C. at 213–14, 479 F.2d at 1196–97 (identification unreliable because of suggestive procedures).

### III.

 We next consider Long's argument, raised before trial and renewed at the end of the government's case, that the Orren Street and Trinidad Avenue charges had been improperly joined for trial. Specifically, Long protested joinder because the offenses were "not similar offenses[, nor] offenses committed in a single act or transaction, nor a series of offenses that [we]re sufficiently connected to each other."

 Super. Ct.Crim. R. 8(a) provides for joinder of offenses when the offenses charged "are of the same or similar character or are based on the same act or transaction or on 2 or more acts or transactions connected together or constituting parts of a common scheme or plan." We review the trial court's joinder decision *de novo. See Ray v. United States,* 472 A.2d 854, 857 (D.C.1984).

The government urges that joinder was proper because the Orren Street offenses

---

3. We do not say that the use of a video automatically cures the suggestiveness present in the lineup procedure. There is no reason to believe that a video pause-and-pan procedure removes all possibility of suggestivity. *See Henderson v. United States, supra,* 527 A.2d at 1268 (photo array unnecessarily suggestive where appellant's photograph was only one underexposed, appellant was only individual with facial hair, appellant was only balding individual, and appellant's photograph was taken long after other photographs). Rather, we merely defer to the trial court's observation that the video presentation made a substantial difference in the way the witnesses received the lineup information.

had been "connected together" with the Trinidad Avenue offenses in the sense that proof of the Orren Street offenses "constitut[ed] a substantial portion of the proof" of the Trinidad Avenue offenses. *See Gooch v. United States,* 609 A.2d 259, 263 (D.C.1992). The facts, however, do not support the government's argument. None of the witnesses to the Orren Street incident saw the Trinidad Avenue incident, and neither crime depended on the other for its furtherance or success. *See Davis,* 367 A.2d at 1263 ("no logical development of or relationship between the offenses because no crime necessarily led to or caused the subsequent offenses").

■ The government also argues that the Orren Street and Trinidad Avenue offenses had been properly joined as part of a "common scheme or plan," because Long had been "walking the neighborhood in search of people to rob." We have previously rejected such an argument when considering joinder of defendants under Super. Ct.Crim.R. 8(b), and we reject the argument in this context as well. *See Jackson v. United States,* 623 A.2d 571, 580 (D.C.1993) ("The goal of obtaining property from others, here money and guns, was too general for joinder of offenses under Rule 8(b)."); *Ray,* 472 A.2d at 858 (common goal of obtaining property from another is "too broad to unite the offenses").

■ The government contends, finally, that the Orren Street offenses were similar in character to the Trinidad Avenue offenses, and we agree. The "similarity of offenses [under Rule 8(a) ] is determined by the content of the indictment"; it is not dependent on whether evidence of one crime would be admissible in the trial of the other. *Winestock v. United States,* 429 A.2d 519, 524 (D.C.1981). In this case, as was true in *Winestock,* the two crimes, as charged, "both involved armed robberies which were closely related in time and place." *Id.* Accordingly, "it cannot plausibly be maintained that they are insufficiently similar to one another to warrant initial joinder under Rule 8(a)." *Id.* at 524–25. We must conclude that the two sets of offenses were properly joined.

## IV.

Long contends the trial court erred nonetheless in denying his severance motion under Super. Ct.Crim.R. 14. He says the Orren Street offenses should have been severed from the Trinidad Avenue charges because the evidence of each would be inadmissible in a separate trial of the other. Long adds he was further prejudiced because he was "precluded from presenting separate defenses" to each group of charges.[4]

We have noted that

[e]ven when offenses are properly joined, it is within the trial court's discretion to sever counts and order separate trials if the defendant would be prejudiced by joinder. *See Ray,* [472 A.2d 854,] 857. Our standard of review of such rulings is abuse of discretion, and appellant must make a showing of compelling prejudice to show such error. *Winestock,* [429 A.2d 519,] 526–27. Of course, there is a potential for

4. Long apparently wanted to present a misidentification defense as to Orren Street and to claim self-defense at Trinidad Avenue, but realistically separate defenses appeared to be possible only if the offenses were tried separately. As explained in Long's reply brief:

Appellant presented a defense of misidentification to the assaults on Orren Street. To present a defense of self-defense or any other inconsistent defense to the murder, which allegedly took place within moments of the Orren Street incident[,] would not appear to be sound trial strategy.

The government contends in its brief that appellant "never indicated that he wanted to, but could not because of the joint trial, present some

other defense." The government's own witnesses, however, Scholethia Monk and Kimberly Bridgeford, testified that Long had said a "man" or "two dudes" had tried to rob him on Trinidad Avenue, and the transcript indicates that Long's counsel informed the court before trial that a joint trial would preclude him "from presenting separate defenses." Again, in the renewed motion for severance during trial, counsel argued that if the joint trial continued, Long would "be prejudiced with respect to putting on a separate defense; namely to the homicide." We, therefore, cannot say that Long failed to preserve his claim of prejudice based on the practical impossibility of separate defenses at a joint trial.

prejudice whenever similar, but unrelated offenses are charged. *Id.* at 527. However, the requisite prejudicial effect for a severance will not be found where the evidence [1] can be kept separate and distinct at trial or [2] is mutually admissible at separate trials. *Id.*

*Gooch,* 609 A.2d at 264–65. Because the incidents were not tried separately and distinctly,[5] resolution of the severance issue turns on mutual admissibility: whether the evidence of each joined offense would be admissible at a separate trial of the other. *Cox v. United States,* 498 A.2d 231, 235 (D.C. 1985) ("Severance should be granted for offenses of 'similar character' 'unless ... the evidence of each of the joined crimes would be admissible at the separate trial of the others.'") (citation omitted).

### A.

■ The first sentence of Super. Ct. Crim. R. 14 provides:

[If] it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the Court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

In response to Long's contention, the government argues that the severance motion was properly denied because evidence of each group of offenses would have been admissible in a separate trial of the other "to explain the immediate circumstances surrounding the offense charged." *Toliver v. United States,* 468 A.2d 958, 960 (D.C.1983). Technically speaking, such evidence "is not other crimes evidence because it is too intimately entangled with the charged criminal conduct." *Id.*[6] Alternatively, the government argues that the evidence of each incident would be admissible in a trial of the other as "other crimes" evidence tending to prove "identity." *See Drew v. United States,* 118 U.S.App. D.C. 11, 16, 331 F.2d 85, 90 (D.C.Cir.1964).[7]

Commonly, the question is whether uncharged criminal conduct shall be admitted in a trial of the charged crime, but in this case

[F]or all the reasons that Judge Dixon gave you, as well as for the reason that as far as I am concerned, the evidence now tells me that this matter is so inextricably intertwined each with each other that there is no way the Government can separate it all and make sense of the whole matter.

They absolutely need for identification purposes, if for nothing else, they absolutely have to have these cases tried together, they should be tried together temporally. And by temporally, I mean both time and place they are as connected as can be.

Recently our en banc court discerned three subcategories of evidence embraced by *Toliver's* "immediate circumstances" rationale: "such evidence (1) is direct and substantial proof of the charged crime, (2) is closely intertwined with the evidence of the charged crime, or (3) is necessary to place the charged crime in an understandable context." *Johnson v. United States,* 683 A.2d 1087, 1089 (D.C.1996) (en banc).

---

5. The evidence as to each offense was not "kept separate and distinct such that it would not be 'amalgamated in the jury's mind into a single inculpatory mass.'" *Gooch,* 609 A.2d at 265 (citations omitted); *see Tinsley v. United States,* 368 A.2d 531, 536–37 (D.C.1976) (citations omitted). Although the prosecutor attempted to structure the trial to separate the incidents, calling first the Orren Street witnesses and then the Trinidad Avenue witnesses, the evidence of the two crimes was closely tied together by some of the witnesses whose testimony pertained to both crimes, *e.g.,* Scholethia Monk, Kimberly Bridgeford, and the homicide investigator, Willie Toland. Moreover, the government's closing argument also brought together evidence of the two crimes. Finally, the strong identification evidence and intent-to-rob evidence from the Orren Street incident served to supply identification and motive evidence for the Trinidad Avenue incident, so there was a substantial likelihood that the jury would cumulate the evidence. Accordingly, we cannot uphold the denial of severance based on the "separate and distinct"— sometimes known as the "simple and distinct"— theory. *See Watson v. United States,* 536 A.2d 1056, 1071–72 n. 30 (D.C.1987) (en banc).

6. The trial court accepted the government's *Toliver* theory in denying Long's renewed motion to sever:

7. In *Johnson supra,* note 6, this court confirmed that "other crimes" evidence is admissible only if it satisfies one of the *Drew* exceptions—motive, intent, absence of mistake or accident, common scheme or plan, or identity—as reflected in Fed. R.Evid. 404(b). *Id.,* at 1092–93.

the question is the admissibility of a charged crime in the trial of another charged crime. If each would be admissible in the other, then there would be no reason why the two should not be tried together; but, if one or both would not meet the test for admissibility in the other, then severance is required. *Cox,* 498 A.2d at 235.

It is important to recognize, however, that the question whether the Orren Street and Trinidad Avenue incidents present an issue of "mutual inextricable linkage" [8] under *Toliver,* or "mutual admissibility" [9] under *Drew,* has practical meaning only if no *Drew* exception, see *supra* note 7, would permit the evidence from each prosecution to be used in the other. More specifically, if *Drew* is available to justify admissibility in each case, one need not worry about whether *Toliver*'s rationale applies. *Bell v. United States,* 677 A.2d 1044, 1047 (D.C.1996). If, on the other hand, *Drew* does not warrant admissibility, the *Toliver* approach may then have utility because *Toliver* does not limit admissibility to prescribed exceptions. *See id.* [10]

In this case, Long presented a misidentification defense at trial. Thus, identity was a contested issue. *See generally Murphy v. United States,* 572 A.2d 435, 438 (D.C.1990); *Thompson v. United States,* 546 A.2d 414, 423 (D.C.1988). Accordingly, if the Orren Street and Trinidad Avenue incidents each reflect evidence that bears on the identity of the assailant in the other, it will not matter whether *Toliver* or *Drew* governs the admissibility decision, especially because under either *Toliver* or *Drew* the court must exclude the challenged evidence unless "the probative value of the other crimes outweighs any prejudicial impact." *King v. United States,* 618 A.2d 727, 730 (D.C.1993); *see Johnson, supra* note 6, at 1098 (both *Drew* and *Toliver* evidence subject to probative value/prejudicial impact balancing test); *Williams v. United States,* 549 A.2d 328, 333 n. 10 (D.C.1988) (*Toliver* evidence subject to probative/prejudicial balancing); *Tabron v. United States,* 410 A.2d 209, 214 (D.C.1979) (same). [11]

We therefore believe it appropriate to scrutinize the evidence of each incident, as it bears on proving identity of the assailant in the other, to determine whether the *Toliver* /*Drew* inquiry has meaning or, on this record, amounts to the same evidentiary route.

The Orren Street evidence informed the jury that, at about 10:30 p.m., on September 8, 1992, a man identified as Damian Long, dressed entirely in black (including a fringe jacket and skull cap) and carrying a gun, had walked past Fox, Davis, and Foster, who were standing next to a car. He then turned back, approached the three, and attempted a robbery at gunpoint. After the assault, the witnesses saw Long headed toward nearby Trinidad Avenue. They heard gunshots soon thereafter.

As for Trinidad Avenue, earlier on the same day at about 5:30 to 6:00 p.m., Scholethia Monk and Kimberly Bridgeford saw Long, dressed entirely in black (including a fringe jacket and skull cap), leave Monk's apartment. Bridgeford saw Long depart in the direction of Trinidad Avenue. Later that evening shortly after 10:30 p.m., Deborah Alford, from her front porch on Trinidad

---

**8.** *Holiday v. United States,* 683 A.2d 61, 82 (D.C. 1996).

**9.** *Cox,* 498 A.2d at 235.

**10.** As we said in *Holiday, supra* note 8, at 82:
Under *Drew,* the mutual admissibility question focuses on particular exceptions to the rule barring other crimes evidence; under *Toliver,* the question is whether evidence of each charged crime is part of the "immediate circumstances surrounding" the other, such that the evidence reflects two transactions (or a series of transactions) so "intimately entan-

gled" that, whether looked at from the beginning (drug sale) or the end (weapon offense) each criminal event is not clearly explainable to the jury without evidence of the other.

**11.** In *Johnson,* the en banc court recently adopted Fed.R.Evid. 404(b) (modified) and 403 (in part) to govern admissibility of other crimes evidence. Now, other crimes evidence, if offered for a proper purpose, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." *Id.,* at 1099 (quoting Fed.R.Evid. 403).

Avenue, saw a man dressed in a black jacket (she did not notice fringe on it),[12] black pants, and a black skull cap walk past her neighbor, Louis Johnson, who was standing next to his car. The man in black turned back and took a pistol from his jacket. Alford then saw the two men "tussling." Frightened, Alford went inside her house and, a few seconds later, heard gunshots. Johnson was found dead, but Alford never identified the assailant. Both Monk and Bridgeford, however, witnessed Long's return to Monk's apartment "panicking and sweating," admitting he had "shot a man on Trinidad Avenue because the man tried to rob him with a knife." Long had blood on his face and was carrying a pistol. His skull cap was missing. The police later found a black skull cap seven feet from where Johnson had been shot. Monk's apartment on Holbrook Terrace was but a few blocks away from where the offenses occurred on Orren Street and Trinidad Avenue.

We believe that the testimony of the Orren Street witnesses, Davis and Fox (who identified Long as a would-be robber), that they saw Long heading in the direction of Trinidad Avenue nearby, and then heard gunshots—all around 10:30 p.m., on September 8, 1992—provided powerful evidence of the Trinidad Avenue assailant's identity. Indeed, this evidence was particularly significant for the Trinidad Avenue prosecution, when coupled with Monk's and Bridgeford's testimony about Long's admission that he had shot a man on Trinidad Avenue, because

the only person who saw the assailant approach Johnson, Deborah Alford, was unable to identify Johnson's killer (although Alford provided a description consistent with Fox's, Davis's, Monk's, and Bridgeford's description of Long). The Orren Street evidence also revealed the assailant's possible motive for approaching Johnson on Trinidad Avenue (robbery).[13]

We also recognize that the Trinidad Avenue evidence was probative of the identity of the Orren Street attacker. Alford's description of an unidentified, black-jacketed, gun-carrying assailant on Trinidad Avenue, combined with the Monk/Bridgeford testimony that Damian Long had come to Monk's apartment with a gun, "panicking and sweating," tended to identify Long as the Orren Street assailant dressed in black seen heading toward Trinidad Avenue just before shots were fired around 10:30 p.m. The fact that Monk testified that Long's skull cap was missing when he returned to her apartment, coupled with the police officer's finding a skull cap on Trinidad Avenue, adds to Long's connection with the Orren Street attack by a man wearing a black skull cap.

▇▇ Accordingly, without regard to the required probative value/prejudicial impact analysis, we can say that the Orren Street and Trinidad Avenue offenses—if not mutually inextricably linked for trial within the meaning of *Toliver/Holiday*—would be mutually admissible under *Drew* in separate trials (and thus would not be joined prejudi-

---

12. The fact that the Orren Street witnesses (Fox and Davis), as well as Monk and Bridgeford, testified that Long's jacket had fringe, whereas Alford could not say the same of Johnson's assailant, is of little moment. Alford was not as close to Long as the other witnesses were, and, in any event, she did not affirmatively say the black jacket did *not* have fringe.

13. The government urges, in addition, that the evidence of the Orren Street incident would have been admissible in the Trinidad Avenue trial under a second *Drew* exception: to show appellant's intent to rob on Trinidad Avenue. We decline to consider this alternative theory because Long removed intent as a contested issue by relying solely on a misidentification defense.

*See Thompson*, 546 A.2d at 423 ("where intent is not controverted in any meaningful sense, evidence of other crimes to prove intent is so prejudicial *per se* that it is inadmissible as a matter of law").

Intent would have been at issue if severance had been granted and Long had argued in a separate trial that he had shot Johnson in self-defense, based on his statement to Scholethia Monk and Kimberly Bridgeford that he had "shot the dude" who tried to rob him. Even so, intent would have been at issue only in the Trinidad Avenue incident; it would not have served as a basis for admitting the Trinidad Avenue incident in evidence in a separate trial of the Orren Street charges.

cially if prosecuted in a joint trial).[14]

## B.

■ We turn to the ruling on probative value/prejudicial impact. The motions judge said, "I don't see prejudice under [Super.Ct.Civ.R.] 14 that would justify severance." The trial judge, in considering the renewed severance motion at trial, referred to the motions judge's ruling and then added his own belief that *Toliver* theory controlled, permitting a joint trial because the cases were "inextricably intertwined." *Supra* note 6.

The trial judge, therefore, said not a word about probative value relative to prejudice. That was unfortunate. At least as to admissibility of Trinidad Avenue evidence in an Orren Street trial, we see a serious question whether probative value outweighs prejudicial impact. Monk and Bridgeford identified the man—Damian Long—whom Alford apparently had seen accosting Johnson: a man fitting the description of the person who had attempted the robbery only blocks away on

Orren Street minutes earlier. This identification evidence from Trinidad Avenue, however, was cumulative of—and of far less probative value than—the direct eyewitness testimony from Fox and Davis (both from the videotape and in court) that Long was the would-be bandit on Orren Street.[15] Furthermore, this weaker identification evidence includes the powerfully prejudicial testimony that Long had committed a murder, not merely an assault, on Trinidad Avenue.

■ The trial judge, after a pretrial severance motion has been denied, has "a continuing obligation to grant a severance if undue prejudice arises as a result of joinder at any time during trial." *Hordge v. United States,* 545 A.2d 1249, 1257 (D.C.1988); *Sousa v. United States,* 400 A.2d 1036, 1041 (D.C.) (same), *cert. denied,* 444 U.S. 981, 100 S.Ct. 484, 485, 62 L.Ed.2d 408 (1979). The trial judge recognized this obligation: "the Court of Appeals seems to indicate that I have to listen [to severance motions] again and again and again and again." Here, however, in denying the renewed severance mo-

---

**14.** The government contends the two offenses were similar enough to be called "signature" crimes, each probative of the perpetrator's identity, and thus mutually admissible in evidence, very simply, solely because of the unique manner in which the crimes had been committed. According to the government:

> [E]ach of appellant's victims was approached while he or she was standing in the street attempting to get into a car. In both the Orren Street and Trinidad Avenue incidents, appellant (1) walked in the street past his victims, (2) walked about a 'car's length' in distance and then doubled back, and (3) pointed the same .38 caliber black revolver at his victims. Moreover, during both sets of offenses, appellant wore a black skull cap, a black jacket (which was unusual since it was a hot summer evening) and black pants.

To be probative of identity as a signature crime, the offense must involve "an unusual modus operandi such that there is a reasonable probability that one person committed all the offenses." *Cantizano v. United States,* 614 A.2d 870, 874 (D.C.1992). The classic case would be the masked rider who cuts the Mark of Zorro on the victim with the tip of a sword. That example, of course, is the extreme; there need not be a single, unique characteristic. *See Easton v. United States,* 533 A.2d 904, 907 (D.C.1987) (citations

omitted). However, there must be "enough points of similarity in the combination of circumstances surrounding the two crimes to create a reasonable probability that the same person committed each." *Id.* at 908; *see, e.g., Crisafi v. United States,* 383 A.2d 1, 4–5 (D.C.1978) (evidence of prior rape admissible to show *modus operandi* where government alleges that, in both prior rape and offense charged, defendant approached a woman in a public place and introduced himself as "Simone," later telephoned the woman, saying he was "George," Simone's roommate, and urging her to date Simone, and then attempted to rape her on the resulting "date"). We cannot say that an assailant, dressed entirely in black, who walks a few steps past an intended victim at a car, and then doubles back to accost the victim with a gun—even when such an approach has occurred twice in a short period of time in a fairly restricted geographical area—has used a sufficiently unusual *modus operandi* to qualify for admission in evidence as a "signature crime." It is difficult to find particular distinctiveness in all-black attire, and it is even more difficult to imagine how an armed street robbery would take place much differently from the way the assailant approached his victims in these two incidents.

**15.** Fox's and Davis's identifications were not seriously shaken at trial.

tion, the trial judge, for his prejudice analysis, merely referred to the ruling of the motions judge, who did not "see prejudice" from a *pretrial* perspective. In effectively relying solely on *Toliver*—*i.e.*, in saying "this matter" (meaning both incidents) "is so inextricably intertwined with each other," *supra* note 6—the trial judge forgot the probative value/prejudicial impact analysis that always is required when carrying out the judge's "continuing obligation" to consider a renewed severance motion during trial.[16]

■ The probative/prejudicial analysis is a discretionary evaluation which an appellate court cannot undertake itself when the trial court fails to do so unless it is clear from the record, as a matter of law, that the trial court had "but one option." *Johnson v. United States,* 398 A.2d 354, 364 (D.C.1979); *see also Wright v. United States,* 508 A.2d 915, 919–20 (D.C.1986); *Ibn–Tamas v. United States,* 407 A.2d 626, 635–36 (D.C.1979). In this case, admissibility of the Trinidad Avenue murder evidence in an Orren Street trial appears to be a more difficult discretionary call than admissibility of the Orren Street assault in a Trinidad Avenue trial, but as to either case we find no sound basis on the record for this court to take over the trial court's function by ruling on probative value/prejudicial impact.

We, therefore, must remand the case for the trial judge to make a probative/prejudicial ruling for each case and thus to rule once again on the severance motion—including consideration of Long's contention that he was prejudiced by his inability, in a single trial, to present separate defenses (Orren Street, misidentification; Trinidad Avenue, self-defense). See *supra* note 4. The judge shall order a new trial of the Orren Street prosecution if he concludes that the murder evidence from Trinidad Avenue should have been omitted from the Orren Street trial. Otherwise, the Orren Street convictions (subject to Part V.A. below) shall stand, without prejudice to Long's right to appeal the severance ruling on remand.[17] Similarly, the

16. It may be true that, in a *Toliver* situation, probative value is more likely to outweigh prejudice than in the ordinary *Drew* situation simply because the interrelationship of ·*Toliver* events may make it difficult to perceive how the evidence of one crime could be omitted from presentation of the other without distorting what happened. That is to say, the greater the overlap of evidence, the more probative and less prejudicial the reciprocal interplay of evidence between one crime and the other is likely to be, since in the extreme case the presentation takes on the appearance of one crime, not two, and thus the idea of separate trials may seem far fetched. On the other hand, in a case where the evidence of two crimes has some overlap, but the incidents—as in this case—are unquestionably distinct, it is all the more important that the trial court very carefully sort out whether some evidence of one of the crimes may have substantial prejudicial impact and minimal probative value in the prosecution of the other—in which case a severance will be required.

17. We have indicated that other crimes evidence on occasion should be tailored to minimize prejudice. *See Ray,* 472 A.2d at 858 (proof that defendants were seen wearing stolen coats fifteen hours after robbery admissible, but evidence explaining that defendants were burglarizing gas station when seen wearing coats "would be" "entirely unnecessary"). Theoretically, it would be possible to sanitize the Trinidad Avenue evidence for a separate Orren Street trial. In such a trial, the Trinidad Avenue identification testimony would have to be trimmed to leave out reference to a murder, and Deborah Alford would be limited to testifying that an unidentifiable man in black had accosted Johnson with a gun at about 10:30 p.m. Scholethia Monk and Kimberly Bridgeford would be limited to saying that Long—dressed in black—had returned to the apartment shortly after 10:30 p.m., admitting he had just assaulted someone on Trinidad Avenue. The police could then testify about finding a black skull cap on Trinidad Avenue nearby.

The trial court will have to decide, as part of the required probative value/prejudicial impact .analysis, (1) whether the preferred approach would be admission of sanitized Trinidad Avenue evidence in a separate Orren Street trial, in order to keep prejudicial homicide evidence from that jury, or (2) whether, because (a) the Fox/Davis identification evidence was strong, (b) The Monk/Bridgeford testimony could be limited to identification of Long as the man who returned "panicking and sweating" at about 10:30 p.m., (c) the murder evidence was highly prejudicial, and (d) because sanitizing the evidence would be complicated, the Trinidad Avenue murder evidence should be kept out of the Orren Street trial altogether, or (3) whether sanitizing the Trinidad Avenue evidence would not work, and the probative value of that evidence outweighs prejudice. If either of the first two instances applies, the court should grant the severance motion; in the third, the court should deny it.

judge shall make a probative/prejudice ruling on admissibility of Orren Street evidence in the Trinidad Avenue trial, and also shall rule on Long's claim of prejudice from his practical inability to claim self-defense for Trinidad Avenue at a joint trial. The judge shall order a new trial, or not, as indicated. Absent a new trial order, the Trinidad Avenue conviction shall stand, subject to Long's right of appeal of that severance ruling.

## V.

■ Long questions (1) the sufficiency of the evidence supporting his convictions for assault with intent to rob two of the three Orren Street victims, Fox and Davis, as well as (2) the sufficiency of the evidence supporting his conviction of the attempted robbery of Louis Johnson on Trinidad Avenue and, consequently, his conviction of the felony murder.[18] When reviewing evidentiary sufficiency, we view the evidence in the light most favorable to the prosecution and "may reverse only when the government has produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt." *Langley v. United States,* 515 A.2d 729, 731 (D.C.1986) (citation omitted).

## A.

■ Long contends there was insufficient evidence that he assaulted Fox or Davis with intent to commit robbery. Davis testified (and no one disputed) that her assailant had pointed his gun at her, and also at Fox, and had ordered them to "get the fuck" out of there. These witnesses then fled the scene, and Fox's mother, the other witness to this incident, provided no testimony that Long's conduct toward Fox and Davis had evidenced in any way an intent to rob them. All the evidence, therefore, showed that Long's robbery effort had been directed entirely at Foster, the third victim.

The statute defines the relevant offense as "assault with intent to ... commit robbery." D.C.Code § 22–501 (1989 Repl.). It does not provide that the assault and robbery victims must be the same, and we have therefore held that a conviction will stand where "the assault of one victim is used to effectuate the robbery of another at the scene." *Moore v. United States,* 508 A.2d 924, 926 (D.C.1986) (per curiam). As in *Moore,* the assault in this case was "done in an effort to carry out the robbery." *Id.* at 925. The evidence accordingly was sufficient to prove that Long had committed an assault with intent to commit robbery when he pointed the gun at Fox and Davis, with the intent to rob Foster standing nearby.

There is, nonetheless, a hitch. The indictment did not specify such an assault/intent to rob; although Long properly could have been indicted for assaulting Fox and Davis with the intent to rob Foster, those were not the offenses the grand jury charged. According to the indictment, Long, "while armed with ... a pistol," had "assaulted Carla Davis [and Sabrina Fox] with intent to steal and take valuable goods and property from the person and from the actual immediate possession of Carla Davis [and Sabrina Fox] by force and violence, against resistance and by putting in fear." Because the only proof at trial was Long's intent to rob Foster, not Fox or Davis, the conviction of the offenses charged—based on intent to rob Fox and Davis—would depend on impermissible constructive amendments of the indictment. *See Joseph v. United States,* 597 A.2d 14 (D.C.1991) (indictment charged assault with intent to kill one person; proof at trial showed an intent to kill another), *cert. denied,* 504 U.S. 928, 112 S.Ct. 1988, 118 L.Ed.2d 585 (1992); *Scutchings v. United States,* 509 A.2d 634 (D.C.1986) (indictment charged obstruction of justice as to one witness; proof at trial concerned a different witness).

■ Although dismissal is frequently the result of such a constructive amendment, *e.g.,*

---

18. Long's additional argument, that the evidence was insufficient to prove his identity as the Trinidad Avenue assailant, is wholly unpersuasive. *See Peterson v. United States,* 657 A.2d 756, 760 (D.C.1995) (evidence sufficient to uphold conviction where appellant was identified as present in area at time of crime and wearing clothing similar to perpetrator's clothing).

*Wright v. United States,* 564 A.2d 734, 737–38 (D.C.1989), we do not do so here. The indictment as written necessarily charged assaults with a dangerous weapon, D.C.Code § 22–502 (1996 Repl.), and the proof at trial conformed to such charges. *See Salim v. United States,* 480 A.2d 710, 716 (D.C.1984). We therefore remand the case for the trial court—if it does not grant a new trial on severance grounds, see *supra* Part III.B.—to reduce the Fox and Davis convictions for assault with intent to commit robbery while armed to convictions for assault with a dangerous weapon, with appropriate resentencings.

## B.

■ Long also challenges evidentiary sufficiency of his attempted robbery conviction and the felony murder that depends on it. According to his brief:

There is no evidence in the record … from which a jury could fairly conclude beyond a reasonable doubt that the gunman attempted to take money from Johnson (he was wearing a bathrobe) or made any attempt to access Johnson's car by demanding or in any way attempting to appropriate the keys to it. As a result, appellant's conviction for attempted robbery while armed and felony-murder must be vacated.

The evidence showed that, moments before the Trinidad Avenue killing, Long had confronted three victims at gunpoint on nearby Orren Street for the express and undisputed purpose of robbing one of them. There was a similarity in the method of criminal operation Long used in each incident. The Orren Street victims had been standing in the street next to their auto. Long had walked in the street past them, then turned with a drawn pistol and returned and rifled the pockets of one of them. Thereafter, he walked away in the direction of Trinidad Avenue. Several minutes later, a few blocks from Orren Street, a witness saw Long walk past parked cars on Trinidad Avenue toward the murder victim, who was standing next to his parked Suzuki sports vehicle. Long passed the victim, then drew his gun and turned back toward the victim.

■ In reviewing a claim of insufficiency of the evidence, we view the evidence in the light most favorable to the government. "It is well established that the jury may infer the intent to rob from the 'totality of the evidence.'" *Singleton v. United States,* 488 A.2d 1365, 1367 (D.C.1985) (citations omitted). The intent to rob can be established when the government has presented facts that "suffice as circumstantial evidence to warrant an inference of the intent of robbery, subject to being negatived by some other explanation by the defendant." *Bowles v. United States,* 142 U.S.App. D.C. 26, 29, 439 F.2d 536, 539 (1970). "There is no requirement that a defendant announce his intent." *Owens v. United States,* 497 A.2d 1086, 1090 (D.C.1985), cert. denied, 474 U.S. 1085, 106 S.Ct. 861, 88 L.Ed.2d 900 (1986).

We have repeatedly upheld convictions in the face of challenges to the sufficiency of the evidence demonstrating an intent to rob where the defendant's conduct was subject to conflicting interpretations and inferences. For example, in *Owens,* 497 A.2d at 1090, the armed robbers confronted the victim in an alley at night, "saying, 'This is it,' [the victim] asked, 'Like, what? What is it,' to which [the robbers] responded, 'Like you know what it is.'" Similarly, in *Accardo v. United States,* 102 U.S.App. D.C. 4, 5, 249 F.2d 519, 520 (1957) (Bazelon, J., dissenting), *cert. denied,* 356 U.S. 943, 78 S.Ct. 787, 2 L.Ed.2d 817 (1958), a man approached a gas station after closing, "produced a gun and said, 'Now, you go over and unlock that door. I'm coming in.'" Although the gunmen in these cases spoke to their victims, the words spoken did not indicate unequivocally an intent to rob—as opposed to an intent to assault, kidnap, or murder the victims. Nonetheless, under the circumstances, the reviewing court concluded that the jury reasonably could have inferred an intent to rob.

Other cases in this jurisdiction demonstrate that a jury may infer intent to rob, as

required for conviction of a predicate felony underlying a felony murder conviction, from similar robberies immediately preceding the charged robbery. In *In re A.L.S.*, 377 A.2d 1149 (D.C.1977), there were two cab-driver robberies and a cab-driver murder within a period of two hours. In the two robbery cases, one assailant had sat behind the driver while the other had pulled a gun and taken money and jewelry from the driver before locking him in the trunk. In the third incident, items taken during the first two robberies had been found at the scene. Trial of the murder case—as a felony murder premised on attempted robbery—had been severed from the robbery cases, but the evidence from both robberies had been admitted in the murder trial to show the intent to rob essential to proving an underlying felony. This court consolidated the appeals from the convictions attributable to all three incidents and affirmed as to each, finding "the modus operandi evidence from the previous robberies gave compelling significance to the events in the murder cab." *Id.* at 1151. The appellants also had been seen fleeing from the murder scene wearing clothing consistent with the clothing they were seen wearing upon arrival at an apartment soon thereafter. *See id.*

In *Calhoun v. United States*, 369 A.2d 605 (D.C.1977), the appellants were convicted of a robbery and a subsequent felony murder where the separate offenses were tried jointly, and thus the evidence from each was admitted as to the other. This court upheld the denial of a requested severance of offenses and affirmed all convictions. Appellants had obtained a gun for the purpose of getting money; they had then beaten and robbed an intoxicated tavern patron after he had left the establishment; they had returned home to divide the proceeds; and, "shortly thereafter," they had gone to another tavern. Then, instead of going in, they said they were "going to check out" a Chinese restaurant across the street. Shots were heard, appellants were seen leaving the restaurant, and money was found missing from the cash register. We concluded that, although the evidence of intent to rob was largely circumstantial, reasonable minds could infer that appellants had entered the Chinese restaurant with the intent to rob. *Id.* at 607.[19]

The similarities between the criminal events in *A.L.S.* and *Calhoun* are comparable to those presented here: the incidents were close to each other in time and/or place; there was a somewhat distinctive manner of carrying out the robbery; and clothing seen on the assailant attempting to rob was similar to clothing seen on the assailant at the murder scene. Additionally, there was no other discernible reason why Long would have approached Johnson; there was no evidence of prior contact between the two that offered an explanation other than an intent to rob Johnson of his Suzuki[20] or any money he might have been carrying.[21] We conclude, accordingly, that the jury reasonably could infer that Long had pulled out a gun as he approached the Trinidad Avenue victim for the very reason he had done so minutes earlier on Orren Street: to commit a robbery.

In sum, (1) the evidence of assault with intent to rob Davis and Fox was not sufficient for conviction under the grand jury's

---

19. *Jones v. United States*, 516 A.2d 929 (D.C.), *cert. denied*, 481 U.S. 1054, 107 S.Ct. 2193, 95 L.Ed.2d 848 (1987), is distinguishable from this case. There, when the victims sought drugs, a scuffle took place, and they were shot. In the absence of any other evidence, the court deemed the evidence insufficient to show an intent to rob. While these facts are to some extent similar to those we consider here, there was considerably more evidence bearing on the attacker's intent in the present case. As noted earlier, it is reasonable to infer, from Long's failed attempt to rob on Orren Street, that when he approached Johnson virtually in the same way minutes later, he still had the intent to rob.

20. That Long left the keys and vehicle behind was easily explainable by reference to the rapidly changed circumstances of a robbery once it had escalated into a killing.

21. Long would not readily have known that his Trinidad Avenue victim was wearing no clothing other than his bathrobe when Long accosted him.

indictment, but (2) the evidence of intent to rob Foster on Orren Street was sufficient to support the attempted robbery of Johnson moments later on Trinidad Avenue and, consequently, was a sufficient predicate for the felony murder.

## VI.

 Finally, Long argues, the government concedes, and we agree that his conviction of attempt to rob Louis Johnson while armed merges with the felony murder conviction, and that the case must, therefore, be remanded to the trial court with directions to vacate the attempt conviction. *See Thacker v. United States,* 599 A.2d 52, 63–64 (D.C. 1991).

\* \* \* \* \* \*

We reverse two of Long's Orren Street convictions for assault with intent to rob Davis and Fox while armed. We remand the case for the trial court to make appropriate probative value/prejudicial impact rulings necessary to decide Long's renewed severance motion, as elaborated above at the end of Part IV. If the court rules that the evidence from the Trinidad Avenue prosecution was too prejudicial for admission in the Orren Street prosecution, or vice versa, then the court shall order a new trial of whatever prosecution was prejudiced by proof of the other. If the court does not order a new trial of the Orren Street offenses, it shall enter judgments of conviction for assault with a dangerous weapon as to Davis and Fox, and all other convictions on the Orren Street charges shall stand affirmed. If the court does not order a new trial of the Trinidad Avenue prosecution, the judgments of conviction for the Trinidad Avenue offenses shall stand affirmed, except that Long's conviction of attempted robbery of Louis Johnson, as the predicate for the felony murder, shall be vacated pursuant to Part VI.

*So ordered.*

KERN, Senior Judge, concurring:

I concur in the result the majority reaches in its opinion.