**Maurice L. FIELDS, Appellant,**

v.

**UNITED STATES, Appellee.**

Nos. 93–CF–492, 93–CF–522, 96–CO–738.

District of Columbia Court of Appeals.

Argued June 5, 1997.

Decided Aug. 14, 1997.

---

W. Douglas Wham, appointed by the court, Washington, DC, for appellant.

Stuart G. Nash, Assistant United States Attorney, for appellee. Eric H. Holder, Jr., United States Attorney at the time the brief

was filed, and John R. Fisher, Carolyn K. Kolben and Christine E. Sykes, Assistant United States Attorneys, were on the brief for appellee.

Before STEADMAN and KING, Associate Judges, and GALLAGHER, Senior Judge.

STEADMAN, Associate Judge.

Appellant Maurice L. Fields was convicted of multiple offenses arising out of two armed carjackings that occurred in February 1991. A photo array introduced as an exhibit was stored at the back of the courtroom during the overnight period following the first day of jury deliberations. The next day the photo array was gone. Fields contends that his due process right to a fair trial was violated by this loss of the photo array. We reject this argument, as well as all the other more conventional issues raised before us, and affirm.

## I.

### A. The February 18 Incident

On February 18, 1991, as Allen Tayman was removing a briefcase from the trunk of his car, two men robbed him at gunpoint and drove away in his car. About ten days after the robbery, Tayman viewed a photographic array at the United States Attorney's office. The Assistant United States Attorney then prosecuting the case laid the photos on the desk in front of Tayman one at a time and asked him if he recognized any of them. After viewing several photos, Tayman picked one of Fields and identified him as the gunman. He then viewed the photos a second time in order to be certain, and again selected the same photo. The photo array was mounted on a posterboard for trial and admitted without objection in the government's case-in-chief. Tayman also made an in-court identification of Fields as the gunman.

Additionally, phone records introduced into evidence at trial showed that on the night of the robbery phone calls were made from Tayman's car phone to the phone numbers of Doreen Kelly and Patricia Ashe. Tayman did not know either Ms. Kelly or Ms. Ashe, but

Ms. Kelly was an acquaintance of Fields and Ms. Ashe was Fields' girlfriend and the mother of his son. Although Fields took the stand at trial, he said nothing about the February 18 charge and presented no evidence with respect to it by way of alibi or otherwise.

### B. The February 20 Incident

Just after midnight on February 20, 1991, as Harold Shelby was getting into his car four men approached him, two from the front of the car and two from the rear. The shorter of the two men at the front of the car, later identified as Fields, pointed a gun at Shelby and demanded his car keys. Shelby gave the keys to the taller man. Shelby was also robbed of several personal items. The taller man got into the driver's seat, while the men at the rear got into the back seat. Eventually, the gunman got into the front passenger seat and the car drove away.[1]

Several hours later, at about 3:00 a.m., Shelby's car was stopped by the police for a routine traffic violation. At that time Fields was driving the car, a taller man named Maurice Ryans was sitting in the front passenger seat, and a young woman was riding in the back seat. Fields was arrested for driving without a permit, and Ryans was arrested after a police officer saw him kick something in the floorboard under the front passenger seat. Under the seat the police discovered a loaded Smith & Wesson .38 caliber handgun.

About an hour later, at a police showup in a parking lot, Shelby identified Fields as the gunman and Ryans as the taller accomplice who drove his car. Additionally, some of Shelby's stolen property was discovered where Fields had been sitting in the back seat of a police car. Shelby also made an in-court identification of Fields at trial, indicating that there was "no doubt in [his] mind" that Fields was the gunman.

Fields testified in his own defense at trial with respect to the events of February 20. He indicated that he got Shelby's car from Ryans and believed that Ryans had rented it

1. This is a clear inference from Shelby's testimony.

from a "pipehead," a crack cocaine user who would rent his car for money to purchase drugs. He also indicated that he was unaware of the gun found under the passenger seat until after his arrest.

## C. The Missing Exhibits

At about 4:15 p.m. on the next to last day of trial, the court completed final jury instructions, and the jury began deliberations. At that point, all the exhibits in evidence except the bullets were sent back to the jury room. The jury deliberated for about one-half hour, and the trial court dismissed the jury for the day. The oversized exhibits, including the photo array, were taken out of the jury room and stored for the night against the wall at the back of the courtroom by the courtroom clerk.

The next morning the oversized exhibits were missing and efforts to locate them proved fruitless.[2] The government took the position that the jury should be allowed to continue deliberations while further efforts were made to locate the exhibits. Fields' counsel requested that deliberations be suspended, and, alternatively, moved for a mistrial. The trial court denied both requests reasoning that the photo array was the most important missing item and that Fields would not be harmed by its absence because Fields had not argued that the array was suggestive, and the jury had had an opportunity to view the array the day before.

At that point the jury sent out a note that read "[j]ury is here and wants the evidence." The trial court sent a reply note that read "[m]embers of the jury, all of the evidence available for your review is being presented to you. You should resume your deliberations." A few minutes later the jury sent out another note reading "[m]ay we please have the rest of the evidence?" Fields' counsel renewed his mistrial motion and the trial court denied it for the same reasons as before. After a long discussion, Fields' counsel

then drafted a note which the court sent in to the jury. That note read "[m]embers of the jury you have received *all* of the exhibits which will be available to you for the balance of your deliberations."

The jury eventually convicted Fields on all counts. With respect to the February 18 incident, Fields was convicted of armed robbery, possession of a firearm during a crime of violence (PFCV), and unauthorized use of a vehicle (UUV). With respect to the February 20 incident, Fields was convicted of armed robbery, PFCV, UUV, carrying a pistol without a licence (CPWL), possession of an unregistered firearm (UF) and unlawful possession of ammunition (UA).[3] Fields now appeals.

## II.

Fields' principal contention on appeal is that the loss of the exhibits, in particular the photo array, deprived him of his due process right to a fair trial. The effect on due process of the loss of physical evidence during trial is an issue of first impression in this jurisdiction, but a good starting place for our analysis is the Supreme Court's most recent case on lost evidence, *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). There the Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58, 109 S.Ct. at 337. We have previously read *Youngblood* to require defendants to show bad faith when claiming a denial of due process from lost or destroyed evidence. *See United States v. Day*, 697 A.2d 31, 35–36 (D.C.1997); *Cantizano v. United States*, 614 A.2d 870, 873 (D.C.1992) (per curiam).

Of course *Youngblood, Day,* and *Cantizano* all involved the loss of evidence that occurred before trial, while this case involves the loss of evidence after it has been admitted at trial. Fields argues that *Youngblood*

---

2. The missing exhibits included photographs of the February 18 crime scene, a diagram of the February 18 crime scene, an enlargement of Tayman's car phone bill, the photo array, photographs of the February 20 crime scene, and a diagram of the February 20 crime scene.

3. Fields' sentences, which included ten years to life for armed robbery for both carjackings, were concurrent for each carjacking incident but consecutive with respect to each of the two incidents.

and its progeny should not govern here because *Youngblood* is premised on concerns about the speculation inherent in reconstructing the potential effect on a jury's verdict of evidence that was never presented at trial, whereas here no speculation is required because the content of the evidence was actually known to the jury.

Instead Fields argues that the analysis of *People v. Ford,* 736 P.2d 1249 (Colo.Ct.App. 1986), and *People v. Lee,* 38 Cal.App.3d 749, 113 Cal.Rptr. 641 (1974), two pre-*Youngblood* cases where courts confronted the problem of evidence lost during trial, should control. In those two cases the courts considered four basic factors in assessing whether the loss of physical evidence during trial deprived a criminal defendant of due process: (1) whether the evidence was lost or destroyed by the prosecution, (2) whether the evidence was exculpatory, (3) whether the evidence was relevant to the defendant's case, and (4) whether it was reasonably possible that the jury, under the circumstances presented, would have reached a different result had the evidence not been lost. *Ford, supra,* 736 P.2d at 1250. *See also Lee, supra,* 113 Cal. Rptr. at 647.

■ We need not decide whether the *Youngblood* or *Ford/Lee* analysis is controlling, however, because under either analysis Fields' due process right to a fair trial was not violated. Here the loss of the evidence was not only not in bad faith, but not even the fault of the prosecution. Rather, as the trial judge recognized, "the [c]ourt [was] at fault because it is the [c]ourt's responsibility to secure the evidence and the [c]ourt did not do that." Additionally, the photo array was not exculpatory or a key piece of evidence as it served only to corroborate Tayman's prior identification of Fields as the gunman. Although the jury did send out notes about the missing evidence, it never singled out the photo array or suggested that the array was particularly important to its deliberations. Furthermore, the photo array was not a component of Fields' defense. Rather, it was introduced in the government's case-in-chief. At the pretrial suppression hearing, Fields never challenged the array on the grounds

that the array itself was suggestive nor did he make any such argument during the course of the trial itself.[4] On the contrary, in closing argument it was the prosecutor who urged the jury to look at the photo array to reinforce Tayman's identification. Finally, given Tayman's in-court identification and the corroborating evidence provided by the phone calls, we think it is not reasonably possible that the jury would have reached a different verdict had the array and other evidence not been lost. Accordingly, we conclude that under either analysis the loss of the evidence did not deprive Fields of a fair trial.

### III.

■ Fields also contends that the trial court erred in denying two motions brought under D.C.Code § 23–110 (1996) alleging ineffective assistance of counsel without holding a hearing. We apply our oft-repeated standard of review. *See, e.g., Ready v. United States,* 620 A.2d 233, 234 (D.C.1993). The first motion, filed by Fields *pro se,* contended that trial counsel was ineffective principally because he failed to call four witnesses to testify on Fields behalf. The fact that Fields has not provided an affidavit from any of these witnesses is itself a sufficient ground to reject without a hearing allegations of ineffectiveness premised on the failure to call them. *Id.* at 234–35. *See also Reaves v. United States,* 694 A.2d 52, 57 n. 6 (D.C. 1997). Likewise, no hearing was required on the other allegations in the motion because these allegations were either capable of resolution on the existing record or would merit no relief even if true.

■ The second motion, filed by appellate counsel, argued that trial counsel was constitutionally ineffective because he failed to press the claim that Fields' rights under the Interstate Agreement on Detainers (IAD), D.C.Code § 24–701 (1996), were violated. Specifically, Fields claims that on June 11, 1992, he wrote a prison official in New York requesting that his District of Columbia detainer be resolved. Fields argues that under the doctrine of substantial compliance, *see*

---

4. The pretrial motion was based on the methodology used in presenting the array.

*McBride v. United States*, 393 A.2d 123, 128 (D.C.1978), the 180–day requirement of Article III of the IAD started to run on June 11, 1992, and, thus, the 180–day requirement was violated when his trial commenced 252 days later on February 18, 1993. In its opposition to the § 23–110 motion, the government filed an affidavit from the New York prison official denying that Fields wrote her on June 11, and affidavits from the officials here in the District responsible for processing IAD requests denying receipt of any such request made by Fields.[5] In *Fex v. Michigan*, 5 U.S. 43, 47–48, 113 S.Ct. 1085, 1088–89, 122 L.Ed.2d 406 (1993), the Supreme Court rejected the very contention pressed here, namely that "a prisoner's transmittal of an IAD request to the prison authorities commences the 180–day period even if the request gets lost in the mail and is never delivered to the 'receiving' State." Because interpretation of the IAD is a matter of federal law, *(William) Parker v. United States*, 590 A.2d 504, 507 n. 10 (D.C.1991), we are bound by *Fex*. Here, no hearing was required because even if it were true that Fields wrote the New York official on June 11, that conduct was not sufficient to trigger the 180–day requirement. Thus, Fields suffered no prejudice from his trial counsel's failure to press this claim.[6]

## IV.

Fields' remaining contentions can be dealt with more summarily:

■ 1. Fields argues that the trial court should have suppressed Tayman and Shelby's out-of-court identifications because they were unduly suggestive and unreliable. We need not consider whether the identifications were unduly suggestive because here the trial court made specific findings of reliability. *See Greenwood v. United States*, 659 A.2d 825, 828 (D.C.), *cert. denied*, — U.S. —, 116 S.Ct. 326, 133 L.Ed.2d 227 (1995) (noting that if an identification is reliable it is admissible even if suggestive).[7] In reviewing a claim of unreliability, "we are bound by the trial court's findings if they are supported by the evidence and consistent with the law." *Jackson v. United States*, 623 A.2d 571, 589 (D.C.1993). Here the record amply supports the trial court's findings that both identifications were reliable.[8]

■ 2. Fields also argues that the trial court erred in not *sua sponte* ordering a severance of the two robberies once Fields decided to testify regarding the February 20 incident but not the February 18 incident. Since Fields did not request severance before the trial court, we review only for plain error. *Taylor v. United States*, 603 A.2d 451, 456 n. 17 (D.C.1992). Here severance was not required because the evidence of each offense was "separate and distinct, and thus unlikely to be amalgamated in the jury's mind into a single inculpatory mass," *West v. United States*, 599 A.2d 788, 792 (D.C.1991), and more is required for severance than the defendant's desire to testify as to one offense but not another, *see Roy v. United States*, 652 A.2d 1098, 1108 (D.C.1995). Under the circumstances we find no plain error.

■ 3. Fields also argues that there was insufficient evidence to support his convictions for CPWL, UF and UA because there was insufficient proof that he "carried" or "possessed" the pistol and ammunition found under the front passenger seat of Shelby's car. We apply the familiar standard of review. *See, e.g., (Charles) Parker v. United*

---

5. No suggestion is made by Fields contravening the affidavits of the District officials.

6. The second motion also renewed the argument made at trial that since Fields was returned to the District by a writ of *habeas corpus ad prosequendum* on October 19, 1992, the 120–day requirement of Article IV was violated when his trial commenced 122 days later on February 18, 1993. Because more than two days of the delay was due to a defense motion for continuance the trial court properly denied the motion. *See Haigler v. United States*, 531 A.2d 1236, 1242 (D.C. 1987) (noting that the time consumed in consideration of defense motions "is simply not counted in the 120–day period").

7. Since we do not reach the issue of suggestivity, we reject Fields' argument that as a result of the loss of the photo array he cannot obtain meaningful appellate review of his suggestivity claim.

8. For essentially the same reason we reject Fields' argument that the evidence of identification was legally insufficient. *See Beatty v. United States*, 544 A.2d 699, 701 (D.C.1988).

*States,* 601 A.2d 45, 51 (D.C.1991). For CPWL purposes, "[a] person carries a pistol about his or her person if it is convenient of access to him or her, and if he or she knowingly has the power and the intention, at a given time, to exercise direct physical control over it." *Henderson v. United States,* 687 A.2d 918, 919 n. 3 (D.C.1996). A person "possesses" a gun for UF and UA purposes when he knowingly has the power and intent to exercise dominion and control over it. *In re F.T.J.,* 578 A.2d 1161, 1162 (D.C.1990) (per curiam). We affirmed a CPWL conviction against a sufficiency challenge on facts very similar to this case in *Porter v. United States,* 282 A.2d 559 (D.C.1971). We have subsequently noted that the facts of *Porter* were sufficient to sustain a conviction for UF as well. *Henderson, supra,* 687 A.2d at 921 n. 6. In *Porter,* a woman observed Porter and a co-defendant with a gun and reported it to the police. 282 A.2d at 559. The police located Porter and his co-defendant sitting in a parked car with Porter in the driver's seat and his co-defendant in the front passenger seat. *Id.* The police discovered a pistol under the front passenger seat, and on appeal

we affirmed Porter's conviction for CPWL. *Id.* at 559–60. Here Shelby observed Fields with a gun during the robbery, and Fields fled the scene by getting into the passenger seat of Shelby's car. When the police located the car, Fields was in the driver's seat, his fellow robber Ryans was sitting in the front passenger seat, and the gun was visible on the floorboard before Ryans kicked it under the seat. Under the circumstances there was sufficient evidence for a rational trier of fact to find Fields guilty of CPWL, UF and UA. *See also Brown v. United States,* 546 A.2d 390, 394–99 (D.C.1988) (upholding CPWL conviction of front seat passenger where gun was found under driver's seat and occupants were in an "ongoing venture").

*Affirmed.*