Harvey K. BROWN, Appellant,

v.

UNITED STATES, Appellee.

No. 96–CF–235.

District of Columbia Court of Appeals.

Argued Feb. 25, 1998.
Decided July 23, 1998.

**96**

Ian A. Williams, Washington, DC, appointed by the court, for appellant.

L. Jackson Thomas, II, Assistant United States Attorney, with whom Mary Lou Leary, United States Attorney at the time the brief was filed, and John R. Fisher, Thomas C. Black, and J. Patricia Smoot, Assistant United States Attorneys, were on the brief, for appellee.

Before KING and RUIZ, Associate Judges, and PRYOR, Senior Judge.

KING, Associate Judge:

Harvey K. Brown was convicted by a jury of distribution of cocaine, in violation of D.C.Code § 33–541(a)(1) (1998 Repl.), and failure to appear in court for a program review hearing on September 13, 1995, in violation of D.C.Code § 23–1327(a) (1996 Repl.). On appeal, Brown argues that the trial court erred in consolidating the two charges and then in denying his motions to sever and for a mistrial. Brown also argues that the trial court erred in denying his motion for a mistrial due to the unexplained loss of assertedly exculpatory photographs after the first day of the jury deliberations. Finding no reversible error, we affirm.

## I.

Brown was arrested on March 24, 1995, charged with one count of distribution of cocaine, and subsequently indicted on that charge.[1] On May 5, 1995, Brown pled not guilty and signed a notice to return to court on May 31, 1995, for the first of four possible master calendar status hearings before Judge Gregory E. Mize. The purpose of these hearings was to determine whether Brown would accept the government plea offer or reject it and go to trial. On three subsequent dates, July 7, 1995, July 19, 1995, and August 16, 1995, Brown returned to court as he had agreed to do.[2] On August 16, his last master calendar status hearing, Brown rejected the government's plea offer and stated his intention to go to trial.

At his first master calendar status hearing on May 31, 1995, Brown entered the Enhanced Drug Treatment Program (EDTP),[3] an intensive drug treatment program open to defendants who otherwise qualify and who test positive for drugs at presentment and twice thereafter, as Brown did. EDTP is a five-day-a-week, six-hour-a-day program involving frequent drug testing, daily counseling, and sanctions for failure to comply with program requirements as evidenced by positive drug tests or absenteeism. Entry into the program is voluntary and a defendant may drop out at any time, although only after obtaining leave of the court. However, participation in the drug program was a condition of Brown's release.

1. He was held without bond following presentment on March 25, 1995, and was released on his own recognizance on March 30, 1995.

2. At each of these court dates, Brown requested a continuance in order to consider further the government's plea offer. The fourth court date, August 16, 1995, was Brown's last chance to accept the plea offer.

3. EDTP is one part of the Superior Court Drug Intervention Project, also called "Drug Court." Its purpose is to link treatment of substance abusing offenders with the supervisory functions of the court.

At the times relevant to this case, Judge Mize was responsible for monitoring participants in EDTP. Participants appeared before Judge Mize for program review hearings to monitor progress in EDTP—which occurred approximately monthly and usually coincided with master calendar status hearings—as well as for failure to comply with program requirements. Before Brown had decided to reject the government plea offer and go to trial, as stated above, Judge Mize presided over Brown's master calendar status hearings as well. Once Brown elected to go to trial, however, Judge Mize certified the criminal case to Judge Truman A. Morrison, III, and a trial date was set for December 13, 1995. At that proceeding, Brown acknowledged in writing his obligation to appear before Judge Morrison for trial on December 13, 1995, as well as his separate obligation to appear before Judge Mize, who continued to monitor Brown's participation in the drug treatment program, for his next EDPT review hearing on September 13, 1995.

Following Brown's election to go to trial, Judge Mize scheduled a compliance hearing for August 31, 1995, because of Brown's numerous absences from EDTP counseling sessions and positive drug tests. Brown failed to appear, and a bench warrant was issued for his arrest. Brown also failed to appear for his scheduled September 13, 1995, EDTP review hearing before Judge Mize and Judge Mize continued the bench warrant. On September 26, 1995, Brown was arrested on the bench warrant and the next day Judge Mize ordered him held without bond under D.C.Code § 23–1329 (1996 Repl.); he remained in custody until trial. Subsequent to his arrest on the bench warrant, Brown was indicted on one count of failure to appear on September 13, 1995, in violation of D.C.Code § 23–1327(a) (1996 Repl.) (Bail Reform Act or BRA).

On November 3, 1995, the government moved to consolidate the two cases, arguing that the facts underlying the BRA charge were admissible in the drug case because Brown's failure to appear on September 13, 1995, evidenced his consciousness of guilt and intent to avoid prosecution. Brown opposed consolidation, maintaining that his failure to appear at an EDTP review hearing was unrelated to the drug prosecution and, therefore, did not evidence consciousness of guilt or flight from prosecution on the drug charge.[4] On November 29, 1995, Judge Morrison issued an order joining the drug charge with the BRA charge, reasoning that joinder was proper because Brown did not surrender himself after the bench warrant was issued and was eventually brought before the court only because he was arrested on the bench warrant. In short, in the judge's view, joinder was proper because Brown offered no evidence that if he had not been apprehended on the bench warrant he would have appeared voluntarily in court for his December 13 trial date. Judge Morrison also indicated that Brown was free to present evidence at trial that the BRA charge stemmed from a drug treatment program rather than from the drug prosecution.

## II.

Brown's trial before Judge Robert S. Tignor began on January 2, 1996.[5] The government's evidence showed that Brown sold crack cocaine to Officer Darrick Wallace at around 8:46 p.m. on March 24, 1995, in the 900 block of Shepherd Street, N.W., receiving prerecorded funds in exchange.[6] Wallace provided an in-court identification of Brown,[7]

---

4. Brown argued that, at most, his failure to appear at the EDTP review hearing evidenced a desire to avoid sanctions for his alleged poor performance in the drug treatment program.

5. The case was continued to that date due to a shortage of jurors on December 13, 1995, and for scheduling reasons. Apparently, Judge Morrison's assignment to the calendar on which the case had been placed ended in mid-December and Judge Tignor's assignment to that calendar began in January. Therefore, the case came before Judge Tignor in January.

6. The prerecorded $20 bill was never recovered. The arresting officers did find $8 in Brown's possession. Officer Wallace testified that prerecorded funds are recovered "most of the time" but "not always."

7. Wallace testified that he stood almost face-to-face with Brown during the course of the transaction, which lasted about one minute, and that he had no problem seeing Brown as there were streetlights.

as did Tonce Cutler,[8] Milton Norris, and Thomas Fontz, the three other officers involved in the undercover-operation who testified at trial.

Over his radio, Wallace gave a "lookout," or description of the seller and his location, to an arrest team. Wallace testified that he described the seller as "a heavy-set, fat, black male wearing blue jeans [and a] tan jacket, [who] had a bald head, and . . . a scar on his head," and who was "light-complected." About five minutes later, Wallace drove past the corner where Brown was standing with members of the arrest team and identified Brown as the person who had sold him the drugs.

Officer Norris, a member of the arrest team, testified that Wallace broadcast a description of an individual wearing "blue jeans, light-colored coat, kind of heavy, had a bald head."[9] Within minutes, Norris reached the 900 block of Shepherd Street, where he "recognized the subject fitting the description and—actually he stood out from what everybody else had on." Norris approached Brown, who was standing with a number of other males and holding a beer in his hand, "grabbed [him] and explained . . .

what was going on." Brown said, "Officer, I just came from out of the store." Another member of the arrest team, Officer Fontz, testified that the lookout given by Wallace "was for a black male, heavy-built, tall, wearing a tan jacket, I believe. Maybe blue jeans, I believe boots, some kind of tan boots." Fontz recalled that none of the other people in the area looked like Brown or matched the lookout.[10]

The government also called Phyllis Jackson, a courtroom clerk familiar with Superior Court procedure and specifically with Drug Court procedure.[11] Concerning EDTP, Jackson testified that participation was a condition of Brown's release. She also testified that defendants are notified orally and in writing of future court dates and of the consequences of failure to appear, and that defendants must sign their names to a written notice of their next court date.[12]

On cross examination, Jackson testified that Brown had failed to appear for a compliance hearing on June 22, 1995, and that a bench warrant for his arrest was issued at that time. However, that bench warrant was quashed when Brown appeared for his July 7, 1995, status hearing.[13] Jackson also testi-

8. Officer Cutler, who served as a security detail for the undercover operation, testified that he observed the drug transaction from 75 to 150 feet away using binoculars. Cutler testified that at no time between the drug transaction and the arrest did he lose sight of Brown.

9. Later in Norris's direct testimony, the prosecutor asked Norris to identify and describe two photographs that had previously been introduced into evidence as government exhibits 3A and 3B. Norris identified them as photographs of Brown on the date of the arrest, "[w]earing a tan, sort of beige jacket, blue jeans and boots."

10. Michael Davis, a friend of Brown, testified for the defense that he was with Brown beginning around 4:40 p.m. on the day of the arrest and that he did not lose sight of Brown during the half hour just prior to the arrest. More specifically, Davis testified that he and Brown had spent most of the late afternoon at Davis's girlfriend's house, some of that time with his girlfriend and the children of Davis and his girlfriend. After leaving the house together sometime around 8:00 p.m., Davis testified, he and Brown walked to a store called the Bus Stop, on Georgia and Shepherd Streets, to purchase beer. Davis stated that he and Brown had just left the store and were with some friends when several police officers apprehended Brown.

Davis testified that Brown neither sold drugs nor spoke with anyone concerning the sale of drugs that evening. On cross examination, Davis conceded that although the other people near Brown at the time of the arrest might have been bald or the same height as Brown, none of them resembled Brown in appearance.

11. She testified that Drug Court has three master calendars, the first for "straight drug cases," meaning no drug treatment component; the second for a drug treatment program involving drug tests twice a week; and the third for EDTP, the more rigorous of the two drug treatment programs.

12. Defendants do not sign written notices for compliance hearings. However, upon entering the program, participants sign an EDTP "contract" stating that they can be called to court at any time.

13. However, Brown's conditions of release changed after his failure to appear on June 22, 1995. Prior to his failure to appear, Brown was released on personal recognizance. On July 7, 1995, Brown was placed on work release, meaning that he was confined to a halfway house which he could leave only at specified times.

fied on cross examination that Brown's court record indicated that he had relapsed on several occasions—including on August 16, 1995, the date he opted to go to trial—but that each time Brown elected to stay in the drug treatment program.

Alec Christoph, Project Manager for Superior Court's Drug Intervention Program, testified for the defense concerning the nature of EDTP and Brown's participation in the drug treatment program.[14] Christoph testified that entry into the program is voluntary but that once an individual enters the program, participation is mandatory and attendance is taken at every segment. He also testified that a new release order is issued once a defendant enters the program. A defendant can withdraw from the program after electing to go to trial, at which time the defendant's criminal case is assigned to a new judge, or at any other time, but must appear before the judge administering the program in order to do so.[15]

Before closing arguments, the government requested that the trial judge give a "flight" instruction with respect to the drug charge.[16] Such an instruction would permit the jury to find that Brown's failure to appear for his EDTP review hearing was evidence of flight from prosecution for the drug charge and thus of consciousness of guilt of that charge.[17] The trial judge denied the request, observing that there wasn't a sufficient basis for a flight instruction with respect to the substantive drug charge.[18] The trial judge explained that his ruling was based upon the government's failure to present any evidence at trial that Brown had been arrested on the bench warrant on September 27, 1995, and that he was therefore before the court for trial because he had been arrested on the bench warrant and held for trial. So far as the trial record showed, Brown appeared voluntarily for trial, thereby refuting any notion that his failure to appear for the hearing was based on any fear of prosecution and any consciousness of guilt engendered by that fear.[19]

Brown then requested a mistrial as to both charges based on the trial judge's ruling that there was an insufficient basis for a flight instruction. That motion was denied.[20] Brown contended that the absence of sufficient evidence supporting a consciousness of guilt instruction meant that joinder was improper. Brown argued, moreover, that because he anticipated a consciousness of guilt instruction with respect to the underlying drug charge, he had introduced evidence of

**14.** See pages 96–97, *supra*.

**15.** Christoph testified that the program's intent is to keep access to drug treatment separate from the legal proceedings; therefore, participants may leave the program at any time but also may elect to stay in the program following the decision to go to trial.

**16.** The government subsequently withdrew that request.

**17.** Criminal Jury Instructions for the District of Columbia, No. 2.44 (4th ed.1993).

**18.** The trial judge did, however, permit the government to argue the avoidance of trial issue with respect to the BRA charge. Thus, the government was free to suggest to the jury that Brown's failure to appear at the two court dates scheduled after Brown decided to go to trial and the trial date was set was evidence that his failure to appear was intentional and motivated by the desire to avoid trial.

**19.** The court observed that based on the evidence,

[i]t stretches it a bit to then argue that his failure to appear on [September 13, 1995] was a result of his desire to avoid trial.... And [that] his desire to elude trial was evidence of consciousness of guilt.... [I]f there was some specific evidence as to the circumstances of how he came before the court, in September ... [when] ... the bench warrant was executed, my conclusion might be different.

**20.** Brown's attorney first moved for severance; the trial judge denied that motion. Defense counsel then stated, "The only remedy I see is dismissal of the BRA charge at this point." The trial judge responded, "If they were severed, it wouldn't be dismissed. It would simply be a mistrial as to the BRA." Defense counsel then moved for a mistrial on the BRA charge; the trial judge denied the motion. In the course of the discussion, the trial judge asked Brown's attorney if he was moving for a mistrial on both counts. The attorney responded that he'd have to think about that. The next morning, just prior to closing arguments, Brown's attorney stated that his motion was for a mistrial on both the BRA and the drug charge. He renews that contention in this court.

Brown's participation in the drug program.[21] He maintained that this evidence was necessary to refute the suggestion that Brown's failure to appear at his EDTP hearings evidenced flight from prosecution on the drug charge and thus consciousness of guilt.[22] Brown maintained that as a result of this evidence, his defense in the underlying drug distribution case was prejudiced by the evidence of his drug use.[23]

The trial judge acknowledged that evidence of Brown's cocaine use tended to cause him prejudice with respect to the cocaine distribution charge.[24] The trial judge addressed that issue by giving a limiting instruction to the jury that the evidence they heard concerning drug use around the time of the arrest and while the case was pending

is not relevant to the question of whether or not Mr. Brown committed the offenses for which he is on trial. You may not consider Mr. Brown's use of drugs on those other occasions in your deliberations on the question of whether or not he is guilty of ... the charge of distribution of cocaine or failure to appear in court.

21. In fact, government witness Phyllis Jackson was the first to mention Brown's participation in EDTP. Brown did not object to her testimony.

22. He argued:
   If there wasn't a BRA charge here, the evidence of Mr. Brown's use of narcotics would never have been brought to the attention of these jurors. It wouldn't have been relevant. But it became relevant to rebut or to defeat or to prevent the consciousness of guilt instruction.

23. The government attorney responded that the evidence concerning EDTP, and thus Brown's drug use, which was introduced by Brown, was irrelevant and unnecessary. Counsel suggested that all the jury needed to be told was "that he was in a program ... as a condition of release, that he failed to report to [the program], and [that] there was a hearing as a status set for that and he failed to appear for that." Although there is much to be said for the point made by government counsel, we do not base our decision on that ground alone.

24. The trial judge stated: "I think that in this community in connection with the pending charge, the appearance that a defendant is a drug user or was a drug user ... is more likely to work to his detriment than to his benefit."

### III.

On the morning of January 4, 1995, after closing arguments, the jury began deliberations. Shortly thereafter, at about 11:22 a.m., the jury asked to see all of the exhibits introduced into evidence at trial.[25] All of the exhibits were delivered to the jurors, who deliberated until about 4:45 p.m. No verdict was reached that day. On January 5, 1995, the jury resumed its deliberations at about 10:15 a.m. Sometime before 11:00 a.m., it came to the attention of the court that government exhibits 3A and 3B, two photographs of Brown taken at the time of his arrest, were missing.[26]

Brown then moved for a mistrial, arguing that the photographs were essential to his misidentification defense and that their disappearance would cause him unfair, irreparable prejudice. Specifically, Brown argued that "the description provided by the undercover officer to the arrest team was of a man wearing beige boots," whereas the missing photographs showed "what looks to be a black pair of sneakers." [27] The trial judge denied the motion on several grounds. First, the trial judge noted that the photographs

25. There were five exhibits introduced into evidence, all by the government: the sealed substance purchased by Officer Wallace (exhibit 1); the Drug Enforcement Agency certificate stating that the substance was cocaine (exhibit 2); two photographs of Brown taken at the time of his arrest (exhibits 3A and 3B); and the court file indicating that Brown failed to appear in court on September 13, 1995 (exhibit 4).

26. The photographs had apparently been collected from the jury room at the end of the first day of deliberations, along with the other exhibits. The next morning, soon after resuming deliberations, the jury again requested all of the exhibits. The court could not locate the photographs.

27. In his closing argument, Brown's attorney had argued that while the arrest team indicated that the lookout was for a man wearing "beige boots," in fact, the jury could look at the photographs and see that Brown was wearing black sneakers: "Now [the photograph] does cut off but I submit to you that if you look closely at that, you will see that [the shoes he is] wearing ... are not beige boots, but black tennis shoes."

   We note that only one member of the arrest team, Officer Fontz, testified that the lookout was for someone wearing "tan boots."

were government exhibits. Second, the trial judge reasoned that even if they had exculpatory potential, the jury had had the opportunity to consider them during the first day of deliberations.[28]

The three remaining government exhibits were delivered to the jury room sometime after 11:00 a.m. on the second day of deliberations. The photographs were never located and it was never determined who was responsible for their misplacement.[29] A little after 2:00 p.m. the same day, the jury announced that it had reached a verdict. It found Brown guilty of both charges. This appeal followed.

### IV.

Brown first argues that the motions judge erred in initially joining the underlying drug offense with the BRA charge because his failure to appear before Judge Mize on September 13, 1995, for his EDTP review hearing was "separate and independent" from the underlying drug prosecution. More specifically, Brown emphasizes that following his decision to go to trial on August 16, 1995, Judge Mize ceded authority over the underlying criminal prosecution, retaining control only over Brown's participation in EDTP.[30] Failure to appear before Judge Mize following that date, Brown argues, did not bear on the criminal matter. Therefore, Brown maintains, this case is distinguishable from *Grant v. United States,* 402 A.2d 405 (D.C. 1979), and later cases where we held that a

bail-jumping charge is connected to and thus joinable with an underlying substantive offense. We disagree.

At the outset, we observe that the BRA charge was not as "separate and independent" from the drug prosecution, as Brown contends here. It is true that as of August 16, 1995, the day Brown elected to go to trial, Judge Mize had authority only over Brown's participation in EDTP, while the underlying criminal matter was assigned to Judge Morrison for trial. However, Brown's participation in EDTP stemmed directly from his indictment on the charge of distribution of cocaine and was a condition of his release on that charge. Thus, the fact that the purpose of EDTP is drug treatment rather than criminal prosecution—and that the drug treatment aspect of Brown's involvement with the court was monitored by a judge different from the judge presiding over Brown's criminal prosecution—did not in and of itself divorce Brown's failure to appear for an EDTP proceeding from the substantive criminal prosecution.[31]

▆▆▆ "Misjoinder under Rule 8 is an error of law." *Ray v. United States,* 472 A.2d 854, 857 (D.C.1984). "Thus, the appellate court subjects the trial court's Rule 8 decision to de novo review." *Id.* (citations omitted). Super.Ct.Crim.R. 13 provides that "[t]he court may order 2 or more indictments ... tried together if the offenses ... could have been joined in a single indictment...."

28. The trial judge stated:
    So to the extent that they have exculpatory potential, there is no reason to believe that that [potential] has not already been realized. It would be highly unlikely that the jurors did not closely scrutinize the photographs yesterday and determine simply the color of the boots.... [W]hile ... we don't know specifically what goes on in a jury room, certainly to the extent that the jurors were impressed with that argument, they must have looked at the photograph [and] determined whether that argument had merit.

29. The trial judge denied Brown's request for a jury instruction that the government was responsible for safeguarding the photographs, based on the suggestion that it was the government attorney who had retrieved the exhibits from the jury room at the end of the first day of deliberations. The trial judge concluded such an instruction would be inappropriate. Instead, the trial judge

instructed the jury that the court was at fault concerning the missing photographs, because it was the court's responsibility to maintain custody of the exhibits.

30. Brown also emphasizes that Judge Mize was no longer authorized to accept a guilty plea from him following his decision to go to trial on August 16, 1995.

31. Nor does the fact that participation in EDTP is voluntary persuade us to the contrary, for at least two reasons. First, if Brown had elected not to participate in EDTP, his case would have been placed on one of the other drug court calendars and the terms of his release, if he was released, may well have been different. Second, withdrawal from the EDTP cannot occur without leave of the court, which Brown never obtained.

D.C.Code § 23–312 (1996 Repl.) (codifying relevant portion of Rule 13). Super.Ct.Crim.R. 8(a), which governs joinder of offenses, states that "[t]wo or more offenses may be charged in the same indictment . . . if the offenses charged . . . are based . . . on 2 or more acts or transactions connected together. . . ." D.C.Code § 23–311(a) (1996 Repl.) (codifying Rule 8(a)). Moreover, "[t]here is, traditionally, a presumption in favor of joinder . . . because joint trials 'do conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial.'" *Carpenter v. United States,* 430 A.2d 496, 502 (D.C.) (en banc) (citation omitted) (referencing Super.Ct.Crim.R. 8(b), which covers joinder of defendants), *cert. denied,* 454 U.S. 852, 102 S.Ct. 295, 70 L.Ed.2d 143 (1981). "In this balance some amount of prejudice will be permitted in favor of judicial economy and the concomitant expedition of cases." *Id.* (citations omitted).

■ "'When a pretrial motion claims misjoinder of . . . offenses, the court ordinarily determines the motion *on the basis of the indictment alone.*'" *Winestock v. United States,* 429 A.2d 519, 524 (D.C.1981) (quoting 8 MOORE'S FEDERAL PRACTICE § 8.06.3, at 8–39 (1980)) (emphasis added); *see also Long v. United States,* 687 A.2d 1331, 1339 (D.C. 1996). "Objections on the ground of misjoinder are 'based on defects in the indictment' within the meaning of [Super.Ct.Crim.R.] 12(b)(2)." *Id.* (quoting 8 MOORE'S FEDERAL PRACTICE, *supra,* § 8.02.2, at 8–4 n. 12).

In *Grant,* we held that "bail jumping is sufficiently 'connected' with a substantive offense when 'the charges are related in time, the motive for flight was avoidance of prosecution, and appellant's custody stemmed directly from the substantive charges.'" 402 A.2d at 407 (quoting *United States v. Ritch,* 583 F.2d 1179, 1181 (1st Cir.), *cert. denied,* 439 U.S. 970, 99 S.Ct. 463, 58 L.Ed.2d 430 (1978)). In that case, appellant was arrested on a charge of unauthorized use of a vehicle (UUV) and conditionally released. Following his arraignment, he was directed to appear for a status hearing some two weeks later but failed to do so. Thereafter, he was formally charged with a BRA violation and the

trial court granted the government's motion to join the BRA charge with the UUV charge. We affirmed the trial court's order of joinder, holding that "[t]his sequence of events, [1] closely related in time, [2] evidences a desire to avoid prosecution for the charges underlying appellant's custody and bail; [3] it manifests a 'connection' sufficient for consolidating the BRA and other charges." *Id.* (citations omitted).

Brown concedes that the present case meets the first and third prongs of the *Grant* standard for joinder of a BRA charge with the substantive offense quoted above. Specifically, he concedes that the charges were related in time and that Brown's custody stemmed from the substantive drug charge. Brown maintains, however, that joinder was improper because the facts of this case failed to satisfy the second prong, that the motive for flight was the avoidance of prosecution. Brown argues instead that his failure to appear on September 13, 1995, had no relation to the drug prosecution.

We reject Brown's contention that the motions court erred in initially joining the BRA charge with the substantive offense based on the inference that Brown's failure to appear at the EDTP court date was motivated by an avoidance of prosecution for the drug offense. Judge Morrison explicitly relied both on the fact that Brown had to be arrested to be brought back before the court, and on the absence of any indication from Brown that he would have returned to court of his own accord had he not been arrested. The judge observed that had Brown returned to court on his own, it might be reasonable to infer that Brown had some problem that was limited to EDTP and that his failure to appear did not bear on the criminal prosecution. However, based on the government proffer and the lack of any defense proffer to the contrary, he reasoned that "it . . . [would be] appropriate for the government to ask the finder of fact to draw consciousness of guilt inferences."

■ On this record, we cannot say that Judge Morrison erred in concluding that the two charged offenses were "based . . . on 2 or more acts or transactions connected together," Super.Ct.Crim.R. 8(a), and therefore

that they "could have been joined in a single indictment," [32] Super.Ct.Crim.R. 13. Because there was no " 'defect[ ] in the indictment,' " *Winestock, supra,* 429 A.2d at 524 (citation omitted), and because under Rule 13 the initial joinder ruling is made on the basis of the indictment, *id.* (citation omitted), we conclude that the trial court did not err as a matter of law in joining the two charges for trial.

### V.

■ Brown argues next that the trial judge erred in denying his motion for a mistrial at the close of all the evidence based on two grounds. First, he argues that the trial judge erred in not ordering a mistrial to "remedy the unfair and substantial prejudice [he] suffered by having to introduce evidence of his drug use to combat a consciousness of guilt instruction." Second, he contends that the mistrial should have been granted once the trial court concluded that the government's evidence did not support a flight instruction. In denying the motion, the trial judge stated, "[S]ometimes the court takes the view that no, this evidence doesn't really warrant a flight instruction and a flight argument. It doesn't follow then that a mistrial is required." We conclude that the trial judge did not abuse discretion in denying the motion for a mistrial at that point in the proceedings. [33]

First, we note in passing that Brown might have avoided the necessity of introducing evidence of Brown's cocaine use during the defense case by moving for a mistrial on the BRA charge at the close of the government's case-in-chief on the ground that, absent sufficient evidence to support a consciousness of guilt instruction, joinder of the BRA with the underlying drug charge was unduly prejudicial. At that point, Brown knew that the government had not established in its case-in-chief—as it had indicated it would do in the proffer to Judge Morrison, who relied heavily on the fact—that Brown had not returned to court voluntarily but appeared only because he had been arrested on the bench warrant. Had that motion been made and granted, [34] Brown would have had no need to introduce any evidence with respect to the BRA charge.

Second, we note that a mistrial was not the only remedy available to the trial judge to mitigate any prejudicial effect of joinder. Super.Ct.Crim.R. 14 authorizes the trial judge to exercise broad discretion in determining an appropriate remedy for prejudice suffered by a defendant due to joinder. *See Carpenter, supra,* 430 A.2d at 501 ("The broad language of Rule 14 ('whatever other relief justice requires') permits the trial court to fashion a less drastic remedy than severance, where appropriate in the circumstances.") (Citation omitted).

We think that the circumstances here are similar to what sometimes occurs when the trial court grants a government motion to admit "other crimes" evidence, *Drew v. United States,* 118 U.S.App.D.C. 11, 331 F.2d 85 (1964) (evidence of other crimes admissible when relevant to motive, intent, the absence of mistake or accident, a common scheme or plan, or identity), but later determines that the government failed to establish satisfacto-

---

**32.** In this case, there were separate indictments for each charge and the trial court granted the government motion to join the two. The analysis applicable for consideration of that motion is the same as would be applied if the two charges were indicted together and the court was considering a motion asserting misjoinder under Super.Ct.Crim.R. 8(a). *See Grant, supra,* 402 A.2d at 407.

**33.** We note that the inferences the jury is told it may draw in the flight instruction may be a heavy burden for a defendant to overcome. Therefore, a trial judge's decision not to give the instruction in a specific case does not necessarily indicate the absence of evidence supporting a consciousness of guilt inference. *See Logan v.*

*United States,* 489 A.2d 485, 489 (D.C.1985) (flight instruction "should be used sparingly") (citation omitted). In short, in a close case a trial court may exercise its discretion and not give the instruction even though it might potentially be warranted under the circumstances. *Id.* ("[B]ecause of the danger of prejudice inherent in permitting the jury to make such an inference, there must be some 'meaningful evidence' of *actual flight* before the instruction can be given.") (Emphasis added) (citation omitted).

**34.** The trial judge's comments relating to his reasons for not giving the flight instruction suggest that he may well have granted such a motion. See note 19, *supra.*

rily the factual predicate for its admission. This sometimes occurs in the other crimes context because there, "[t]he trial court may act within its discretion to conduct its pre-trial inquiry on the admissibility of the other crimes evidence by means of a 'detailed proffer from the government' instead of holding, in effect, a bench trial of the other crime. . . ." *Daniels v. United States*, 613 A.2d 342, 347 (D.C.1992) (quoting *Groves v. United States*, 564 A.2d 372, 375 (D.C.1989), modified *per curiam*, 574 A.2d 265 (D.C. 1990)). Therefore, in the occasional case, admission of the other crimes evidence is proper based on the proffer, but ultimately, the government fails to present at trial sufficient evidence of the other crime to meet the required burden of proof.

In those circumstances, we have held, as discussed below, that a mistrial is not the only means of curing prejudice which results from insufficient proof of an "other crime." The same principle applies to the circumstances of this case, which are virtually identical: here, the prosecutor failed to present evidence at trial that had been proffered, i.e., the fact that Brown was arrested on the bench warrant and brought before the court rather than voluntarily appearing. Significantly, the evidence proffered but not proven in this case, as in the other crimes context, was the *sine qua non* for the motions judge's decision to order joinder at the outset.

■ In the other crimes context, where proof does not meet proffer, we have said:

If the government fails somehow to present at trial all the evidence that it had proffered or if the trial court finds the evidence in some part deficient because of credibility problems or otherwise, the trial court considers the evidentiary sufficiency and tailors the remedy according to the severity of the failure of proof. The trial court, in its discretion, may, for example, restrict the government's closing argument, give limiting instructions to the jury, or, where it deems there is a probability of 'a miscarriage of justice,' declare a mistrial.

*Daniels, supra,* 613 A.2d at 347. In short, although a mistrial is one option where other crimes evidence is presented to the jury but where there is ultimately a failure to meet the required evidentiary standard for admissibility, there are other less drastic remedies available to mitigate or eliminate the prejudice suffered by a defendant.

■ Similarly in this case, we are satisfied that remedial measures other than mistrial were available to mitigate against or eliminate the prejudice Brown suffered when evidence of his BRA charge, and of his participation in a drug treatment program, came before the jury despite the fact that the government ultimately failed to adduce sufficient evidence to support a consciousness of guilt instruction. "When inadmissible evidence has come before a jury, the grant or denial of a motion for mistrial is committed to the sound discretion of the trial court." *Carpenter, supra,* 430 A.2d at 506 (citations omitted).

Here, the trial judge gave a limiting instruction emphasizing that evidence that Brown had used drugs around the time of the charged offense was not to be considered in determining his guilt on the drug charge. We are satisfied that the trial judge did not abuse discretion in determining that a limiting instruction was sufficient to cure any prejudice caused by evidence relating to Brown's failure to appear for a program review hearing. *Cf. Carpenter, supra,* 430 A.2d at 506 (cautionary instructions were sufficient to ameliorate any prejudice from inadmissible, incriminating reference to appellant in co-defendant's out-of-court confession which came before jury when redaction went awry). Moreover, as we have said *supra* at 19, the problem was in large part of Brown's own making, because he would have had no reason to present the damning drug treatment evidence,[35] had he moved for a mistrial on the BRA charge after the government had presented its case-in-chief without a showing that Brown had been arrested on the bench warrant—a fact which was the linchpin of the court's joinder ruling.

**35.** Nor, as the government correctly argued to the trial court, was it necessary for Brown to present all of the evidence, especially the most damaging, that he in fact presented on the subject. See note 23, *supra*.

■ For all these reasons, we conclude that Brown's right to a fair trial was not violated due to joinder of the BRA charge with the substantive drug distribution charge. We are convinced that the trial court's limiting instruction adequately informed the jury as to the evidence that could be used to determine Brown's guilt on the drug distribution charge. *See, e.g., Powell v. United States,* 684 A.2d 373, 380 (D.C.1996) (jury presumed to follow instructions). Therefore, the trial court did not err in denying the motion for mistrial.

### VI.

Finally, Brown argues that the disappearance of two photographs after the first day of jury deliberations deprived him of a fair trial and therefore violated his Fifth Amendment right to due process. The lost exhibits were photographs of Brown taken shortly after he was arrested. Based on our recent decision in *Fields v. United States,* 698 A.2d 485 (D.C.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1203, 140 L.Ed.2d 331 (1998), we reject that argument.

In *Fields,* as in the present case, physical evidence was lost between the first and the second day of jury deliberations in a trial for offenses arising out of two armed carjackings, although in *Fields,* the jury had deliberated for only about one-half hour on the first day. In contrast, in this case, the jury had the photographs on the first day from sometime after 11:22 a.m., when it asked to see all of the trial exhibits, until it ended its deliberations for the day at 4:45 p.m. A number of exhibits were lost in *Fields,* including a photographic array which the trial judge concluded was the most important of the missing exhibits. The trial judge denied defense motions for a suspension of deliberations or a mistrial, reasoning that the absence of the photo array was not harmful to the defense because Fields had not argued that it was

suggestive and because the jury had had an opportunity to see the array the day before.

On appeal, we held that the loss of the evidence did not deprive Fields of his right to a fair trial. We relied, in part, on *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), a case involving evidence lost *prior to* trial, where the Supreme Court held that a criminal defendant must show bad faith to establish a due process violation as a result of lost evidence. We also noted that pre-*Youngblood* state court cases had identified four factors to be considered when determining whether the loss of evidence *during* trial deprived a criminal defendant of due process:

> (1) whether the evidence was lost or destroyed by the prosecution, (2) whether the evidence was exculpatory, (3) whether the evidence was relevant to the defendant's case, and (4) whether it was reasonably possible that the jury, under the circumstances presented, would have reached a different result had the evidence not been lost.

*Fields, supra,* 698 A.2d at 489 (citing *People v. Ford,* 736 P.2d 1249, 1250 (Colo.Ct.App. 1986) and *People v. Lee,* 38 Cal.App.3d 749, 113 Cal.Rptr. 641 (1974)). Without deciding whether the *Youngblood* or the *Fields/ Ford/Lee* test should control in this jurisdiction, we concluded that Field's right to due process was not violated under either standard. We reached that result because we were satisfied that there was neither evidence of bad faith nor a denial of due process taking into account the four-factor test described above.[36]

■ Similarly, we are satisfied that, applying either standard,[37] Brown's right to due process was not violated by the loss of the photographs. First, applying *Youngblood,* there was no evidence whatsoever that the disappearance of the two photographs was due to bad faith. For the same reason, under the first factor of the *Fields/Ford/Lee*

---

**36.** First, the trial court, not the prosecution, was responsible for the loss of evidence; second, the photo array was neither exculpatory nor even a key piece of evidence; third, the photo array was part of the government's case-in-chief and it was the prosecutor who, in closing argument, urged the jury to look at the photo array; and finally, given the strength of the other evidence it was

"not reasonably possible that the jury would have reached a different verdict" had the evidence not been lost. *Fields, supra,* 698 A.2d at 489.

**37.** Thus, as in *Fields,* we have no need to decide which standard controls in the present case.

test, there was no evidence that the prosecution lost or destroyed the evidence.[38]

The second and third factors, however, potentially weigh, at least somewhat, in Brown's favor in light of Brown's argument that the photographs depicted Brown wearing black sneakers rather than the tan boots Officer Fontz recalled from the lookout.[39] Although, as in *Fields*, the two photographs were introduced by the government in its case-in-chief, in the present case, unlike *Fields*, the photographs were arguably exculpatory and therefore relevant to Brown's misidentification defense. As discussed *supra* note 29, defense counsel mentioned the photographs during his closing argument, claiming they were exculpatory when he directed the jury to view them closely during deliberations.[40]

However, even assuming that factors two and three operate in some small measure in Brown's favor, in light of the relative strength of the evidence against Brown,[41] as well as the fact that the jury did have at least several hours on the first day of deliberations to view the photographs and consider the argument that they were exculpatory, we believe, applying the fourth factor, that it was not "reasonably possible that the jury, under the circumstances presented, would have reached a different result had the two photographs not been lost." *Fields, supra,* 698 A.2d at 489 (citations omitted). Ultimately, therefore, we are convinced that the requirements of due process were satisfied and that Brown received a fair trial.

For the foregoing reasons, Brown's convictions below are hereby

*Affirmed.*

---

38. Although Brown's attorney suggested to the trial judge that the prosecutor may have been the one to retrieve the photographs from the jury room and therefore the last to have seen them, it *is ultimately unclear from the record how the photographs were lost.* Moreover, in this case, as in *Fields*, the trial judge recognized that the court was at fault for the loss of evidence because it was the court's responsibility to secure the evidence. See note 29, *supra.*

39. As stated *supra* at 98, Officer Fontz testified that he heard Officer Wallace broadcast a lookout "for a black male, heavy-built, tall, wearing a tan jacket, I believe. Maybe blue jeans, I believe boots, some kind of tan boots." None of the other officers who testified at trial recalled either seeing Brown's footwear at the time of the arrest or hearing any description of it in the lookout. For example, Officer Wallace testified that he broadcast a lookout for "a heavy-set, fat, black male wearing blue jeans, tan jacket, [who] had a bald head, and ... a scar on his head" and who was "light-complected." *Supra* at 98. Officer Norris testified that he heard Officer Wallace broadcast a lookout for someone wearing "blue jeans, light colored coat, kind of heavy, had a bald head." *Supra* at 98. Finally, Officer Cutler did not testify at trial concerning the description of Brown; he did testify, however, that he kept Brown in sight the entire time from the transaction to when Brown was arrested. See note 8, *supra.*

40. We note, however, that any exculpatory nature of the photographs is speculative based on the record before us. First, as the government pointed out, the only suggestion that Brown was wearing black tennis shoes in the photographs came from Brown's attorney in his closing argument. There was no testimony to this effect. The only *testimony* concerning what the photographs showed came from Officer Norris, who, in fact, described Brown in the photographs as wearing *boots.* See note 9, *supra.* Also, as defense counsel's comments during closing argument indicate, *supra* note 27, the photographs were cropped and thus gave an incomplete portrayal of Brown's footwear.

41. Officers Wallace, Norris, Fontz, and Cutler all identified Brown in court. The arrest team (which included Norris and Fontz) located Brown within minutes of the drug sale based on a description broadcast by Wallace, who, minutes after the arrest, identified Brown as the man who had sold him the drugs. Wallace testified that he stood almost face-to-face with Brown during the drug transaction and had about a minute to observe Brown under good lighting conditions. In addition, Cutler testified that he watched Brown through binoculars from the time of the transaction to the time of ·the arrest, and that the man arrested (Brown) was the same man who engaged in the transaction with Officer Wallace. Finally, the seller, as described by Wallace, had a distinctive, less-than-common appearance: He was a fat, bald-headed man with a scar on his head. That description fits Brown. Moreover, the officers, as well as Brown's friend Michael Davis, all testified that no one else at the crime scene resembled Brown. Finally, the arresting officers also testified that no one present matched the description of the seller given by Wallace. Thus, of those present at the scene, the description broadcast fit Brown, and no one else.